1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

EZEKIEL JOHNSON, T-43903,          )     No. C 10-4682 CRB (PR)
                                   )
            Petitioner,            )     ORDER DENYING PETITION
                                   )     FOR A WRIT OF HABEAS
      vs.                          )     CORPUS AND DENYING
                                   )     CERTIFICATE OF
TIM VIRGA, Acting Warden,          )     APPEALABILITY
                                   )
            Respondent.            )
_____)

Petitioner seeks a writ of habeas corpus under 28 U.S.C. § 2254.  In an order filed on February 15, 2011, the court found that his petition challenging a conviction and sentence from Contra Costa County Superior Court, when liberally construed, stated a cognizable claim under section 2254 and ordered respondent to show cause why a writ of habeas corpus should not be granted.  Respondent has filed an answer to the order to show cause.  Petitioner has not filed a traverse.  Having reviewed the papers and the underlying record, the court concludes that petitioner is not entitled to habeas corpus relief.

**STATEMENT OF THE CASE**

A Contra Costa County jury convicted petitioner of first degree murder and conspiracy to commit assault with force likely to cause great bodily injury.  The jury found true allegations that the offenses were committed for the benefit of a street gang, but found not true allegations that petitioner personally used deadly and dangerous weapons (a knife

1   and a milk crate).  The trial court sentenced him to a total of thirty-six years to life.

2        On direct appeal the California Court of Appeal accepted the State's concession that

3   the ten year gang enhancement should be stricken, and ordered the superior court to amend

4   the abstract of judgment to reflect a sentence on count one of twenty-five years to life, with a

5   minimum parole eligibility of fifteen years, and that the one-year term enhancement was

6   imposed for a prison prior, not a gang enhancement.  Having reduced the sentence to a total

7   term of twenty-six years to life, the court of appeal otherwise affirmed the judgment.  People

8   v. Johnson, No. A114514, 2009 WL 1154220 at *1, 38 (Cal. App. 2009).  The California

9   Supreme Court denied petitioner's petition for review.

10                          **STATEMENT OF THE FACTS**

11       The California Court of Appeal summarized the facts of the case as follows:

12            According to testimony given at trial, on the night of July 24 and in the
     early morning hours of July 25, 2003, Neal Fiu[1] and four teenage members
13   (Daniel G. (Danny G.), Joey O., Sammy V., and Brandon V.)[2] of the street
     gang Sons of Death (SOD) were on Fiu's front porch near the corner of South
14   15th Street and Maine Avenue in Richmond, drinking alcohol. Defendant had
     previously been seen at that corner conducting hand-to-hand transactions that
15   appeared to be drug sales, and he had been seen accessing a trash can where
     Fiu kept drugs at his house. Also present on July 24 were Javier Cervantes
16   (Javi) and Juan Cervantes (Juan), both of whom, along with defendant,
     appeared to be affiliated with the "15th Street" gang that hung out near the
17   corner of 15th Street and Maine Avenue. Fiu was a longtime member of SOD;
     defendant was not a member of the gang.
18
              While Fiu, the teenagers, Juan, and Javi were sitting on the front porch,
19   Salvador Espinoza walked past, yelled the name of a gang (EHL, or Easter Hill
     Locos), and threw a gang sign. Taking this as a challenge, and because they did
20   not want to appear weak, the four teenagers and Fiu approached Espinoza, and
     they started fighting. Danny G. pulled out a .38-caliber weapon, said "SOD,"
21   and aimed the gun at Espinoza's face. Fiu pulled down Danny G's hand, and
     said to beat up Espinoza instead. Espinoza tried to escape, but Brandon V.
22   caught him and threw him to the ground. The teenagers, Juan, Javi, and Fiu

23   ────────────────

          [1] Codefendant Fiu was originally charged in the same action with defendant, but the
24   trial court granted defendant's motion to sever. Fiu was tried before defendant and was
     convicted of second degree murder, conspiracy to commit assault with force likely to cause
25   great bodily injury, street terrorism, and assault with force likely to cause great bodily injury.
     This court affirmed the convictions in a published opinion. (People v. Fiu (2008) 165 Cal.
26   App. 4th 360.)

27            [2] At the time of the incident, the four boys were juveniles. All were charged with
     murder; all admitted violations of section 245, subdivision (a)(1) (assault with force likely to
28   inflict great bodily injury) in juvenile court in exchange for agreements to testify.

                                        2

punched and kicked Espinoza in the head and body until he lost consciousness. The group left Espinoza lying on the ground, apparently still alive, and everyone returned to the porch to continue drinking.

After the group returned to the porch, defendant arrived in a car, and Juan went to speak with him. Defendant approached Fiu's house and started talking to Fiu[3] and the teenagers, who told him that they had beaten up the victim, and that he was lying on the ground nearby. At one point defendant asked whether the victim was "EHL." Defendant said he wanted to kill Espinoza, but Fiu told him to leave him (Espinoza) alone. Defendant left the house and went with the teenage gang members to where the victim was lying, and kicked and hit Espinoza. Defendant asked for a gun so that he could kill Espinoza, but no one in the group had one to give to him at the time, because Fiu had taken the gun from Danny G. Defendant got a milk crate, put it over Espinoza's neck, and jumped on it at least twice. Finally, defendant and Joey O. (at defendant's direction) stabbed Espinoza in the neck. Afterward, defendant and Javi went into the house, and defendant washed his hands with bleach. While in the house, defendant referred to a fight with Easter Hill (which witnesses testified was also known as EHL). Defendant then drove the four young gang members to the home of Danny G.'s mother. She washed the blood from their clothes.

<u>Johnson</u>, 2009 WL 1154220 at *1-2 (footnotes in original but renumbered).

## DISCUSSION

**A.    Standard of Review**

This court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

The writ may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  18 U.S.C. § 2254(d).

---

[3] Danny G. testified that although he never personally associated with defendant, he had seen defendant talk with Fiu in the past, and they appeared to be "good friends." Sammy V. testified that he saw defendant at Fiu's house almost every time he went there in the summer of 2003. Fiu's wife also testified that she saw defendant at her and Fiu's house every day around July 2003.

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 412-13 (2000). "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413.

"[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411. "[A] federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." Id. at 409.

The only definitive source of clearly established federal law under 28 U.S.C. § 2254(d) is in the holdings (as opposed to the dicta) of the Supreme Court as of the time of the state court decision. Id. at 412. While circuit law may be "persuasive authority" for purposes of determining whether a state court decision is an unreasonable application of Supreme Court precedent, only the Supreme Court's holdings are binding on the state courts, and only those holdings need be "reasonably" applied. Id.

**B.      Claims & Analysis**

**1.      Jury Venire**

Petitioner alleges that the jury venire was not a representative coss-section of the community. He asserts that the county's hardship policy allows potential jurors to be excused from jury service if they can document that it would take more than an hour and a half to get to Martinez by public transportation. It takes nearly two hours for jurors to travel by public transportation from Richmond, where a high proportion of African-Americans reside, to Martinez, so the policy allegedly tends to exclude black prospective jurors.

United States District Court
For the Northern District of California

"There have been two types of constitutional challenges to jury selection methods. The first is an equal protection challenge under the Fourteenth Amendment, and the second is a fair representation challenge under the Sixth Amendment."  United States v. Esquivel, 88 F.3d 722, 726 (9th Cir. 1996).  Petitioner clearly presents a fair cross-section claim, and he may be attempting to make an equal protection claim as well.

### a.   Fair Cross-Section

The Sixth Amendment provides that a criminal defendant is entitled to a jury pool representing a fair cross-section of the community.  Holland v. Illinois, 493 U.S. 474, 476 (1990).  "In order to establish a prima facie violation of the fair-cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process."  Duren v. Missouri, 439 U.S. 357, 364 (1979).  It is unnecessary to prove discriminatory intent or that the person asserting the claim is a member of the "distinct," excluded group.  Esquivel, 88 F.3d at 726.

The Ninth Circuit has adopted the "absolute disparity" test for measuring the representativeness of a distinctive group in the jury pool.  Id.  The "absolute disparity" is determined by subtracting the percentage of the group in the jury pool from that group's percentage of the relevant total population.  Id.  The court in Esquivel determined that an absolute disparity of only 4.9 percent was insufficient to find a sixth amendment violation, pointing to United States v. Suttiswad , 696 F.2d 645, 649 (9th Cir. 1982),  where a 7.7 percent absolute disparity was deemed unsubstantial and constitutionally permissible.  See also Rich v. Calderon, 170 F.3d 1236, 1239-40 (9th Cir.), amended, 187 F.3d 1064, 1068 (9th Cir. 1999) (in view of cases permitting absolute disparity below 7.7%, the exclusion of a group constituting 7.7% or less of the total population is, standing alone, generally insufficient to establish a prima facie case of systematic exclusion).

Here, the stipulated facts on which this claim was submitted to the trial court were that about 8.9 percent of Contra Costa's population over the age of 18 identifies itself as black, and about 6.09 or 6.14 percent of residents who appear for felony jury trials identify themselves as black.  Johnson, 2009 WL 1154220 at *3.  The disparity is less than three percent, well below the 7.7 percent that the Ninth Circuit has deemed insubstantial. Petitioner thus failed to show the second of the three elements of his prima facie fair cross-section claim, that the representation of African-Americans was not fair and reasonable in relation to the number of blacks in the community.

Even if petitioner had satisfied the second requirement, his claim would fail at the third.  He claims that the county's hardship policy of excusing potential jurors who had to travel more than an hour and a half to get to Martinez by public transportation was sufficient to establish the third element of his prima facie claim, that the underrepresentation of blacks was due to systematic exclusion.  Pet. at 7.  He argues that it takes nearly two hours for jurors to travel by public transportation from Richmond, where a high proportion of African-Americans reside, to Martinez, so the policy tends to exclude African-American jurors from the venire.

In United States v. Rodriguez-Lara, 421 F.3d 932 (9th Cir. 2005), the Ninth Circuit discussed the third prong:

> The third Duren prong requires a showing that the underrepresentation results from a systematic exclusion of the distinctive group in the jury-selection process. Under Duren, "disproportionate exclusion of a distinctive group from the venire need not be intentional to be unconstitutional, but it must be systematic." Randolph, 380 F.3d at 1141. Courts have found systematic exclusion to be shown, for example, where a jury selection system allowed women to opt out of service more easily than men, where a computer error resulted in the exclusion of individuals from two regions where a large proportion of racial and ethnic minorities lived, and where jurors were selected based on wholly subjective criteria. Id. (citing Duren itself, United States v. Jackman, 46 F.3d 1240 (2d Cir.1995), and Gibson v. Zant, 705 F.2d 1543 (11th Cir.1983), for these examples). We determined that a defendant failed to satisfy the "systematic exclusion" prong where he presented a hypothesis as to the cause of Hispanic underrepresentation but "presented no evidence to support this suggestion." Id. at 1141.

Id. at 944-45.

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

Here, as in <u>Rodriguez-Lara</u>, petitioner "presented no evidence to the trial court as to how the hardship policy was actually implemented, let alone that African-Americans were granted a disproportionate number of exemptions or excusals." <u>Johnson</u>, 2009 WL 1154220 at *4. He thus has failed to make out a prima facie case on the third <u>Duren</u> prong, as well as the second.

The fair cross-section claim is without merit.

**b.    Equal Protection**

In his petition, petitioner says that "[t]he elements which a defendant must establish in order to make a prima facie showing of a violation of the fair cross-section (or equal protection) . . . requirements are well established." Pet. at 6, 7. He cites <u>Duren</u>, a fair cross-section case, <u>Rodriguez-Lara</u>, also a fair cross-section case, and <u>Castaneda v. Partida</u>, 430 U.S. 482 (1977), which is an equal protection case.

Although it is open to argument whether this is sufficient to raise an equal protection claim, the court will assume that the statement is sufficient and consider it.

In order to establish a prima facie equal protection violation in the jury selection process, an appellant "must show that the procedure employed resulted in substantial underrepresentation of his race or of the identifiable group to which he belongs." <u>Esquivel</u>, 88 F.3d at 726 (quoting <u>Castaneda</u>, 430 U.S. at 494.)

Here, the absence of any evidence that the hardship policy was the cause of the purported underrepresentation of African-Americans is fatal to the equal protection claim. See <u>Castaneda</u>, 430 U.S. at 494 (requiring causation).

**c.    Summary**

Because petitioner's rights were not violated in connection with the jury venire, the state courts' rejections of these claims could not have been contrary to, or unreasonable applications of, clearly established Supreme Court authority.

**2.    <u>Batson</u>**

Petitioner contends that the prosecution's peremptory strikes of three African-American prospective jurors were motivated by racial discrimination.

**United States District Court**
For the Northern District of California

1    The Equal Protection Clause forbids challenging potential jurors solely on account of

2  their race.  Batson v. Kentucky, 476 U.S. 79, 89 (1986).  A violation of equal protection

3  under Batson is established in a three-step process.  First, the defendant must make a prima

4  facie showing that the prosecutor has exercised peremptory challenges on the basis of race.

5  Id. at 96-97.  That is, the defendant must demonstrate that the facts and the circumstances of

6  the case "raise an inference" that the prosecution has excluded venire members from the petit

7  jury on account of their race.  Id. at 96.  If the defendant makes this showing, the burden then

8  shifts to the prosecutor to articulate a race-neutral explanation for striking the jurors in

9  question.  Id. at 97.  Finally, the court must determine whether the defendant has carried his

10  burden of proving purposeful discrimination.  Id. at 98.  To fulfill its duty, the court must

11  evaluate the prosecutor's proffered reasons and determine whether there was intentional

12  discrimination.  Lewis v. Lewis, 321 F.3d 824, 831 (9th Cir 2003).

13    The findings of the state trial court on the issue of discriminatory intent are findings of

14  fact.  Purkett v. Elem, 514 U.S. 765, 769 (1995).  To overcome such a finding the petitioner

15  must show the state court's conclusion to be "an unreasonable determination of the facts in

16  light of the evidence presented in the state court proceeding."  Miller- El v. Dretke, 545 U.S.

17  231, 240 (2005) (citing 28 U.S.C. § 2254(d)(2)).  Therefore, a federal habeas court can only

18  grant habeas relief "if it was unreasonable to credit the prosecutor's race-neutral explanations

19  for the Batson challenge."  Rice v. Collins, 546 U.S. 333, 338-40 (2006).  The standard is

20  demanding, but not insatiable.  Miller-El, 545 U.S. at 240.

21         **A.      Prospective Juror R.C.**

22    The court of appeal set out the background of this claim:

23       Prospective juror R.C. stated during jury selection that he was
concerned about having to serve on a long trial, because he had just taken out
24  an equity line of credit to start a residential real estate business and could not
afford to spend weeks away from his job. R.C. also stated that it would be
25  difficult to listen to testimony from gang members, but that he would listen. He
said he "look[ed] at everyone as being either knowing of the truth about Christ
26  or not knowing about the truth," and that he found it "bothersome" that some
people did not have knowledge of "the truth." He mentioned that he had prior
27  experience with drug use, and that although he would judge fairly, he could not
help but "include that [his drug experience] in anything." He explained that "I
28  used drugs 12 years ago for like 20 years from 20 to 40, and I know what it's

8

like to be out there. And I have been a born again Christian for 12 years now, and it hurts me to see and hear about all the problems that are caused by drugs and caused by situations that [the drugs] have put people in, and people have been hurt and families have been devastated because of the violence and the drugs and things."

R.C. also stated that, in general, he chose not to look at graphic photographs, and that it concerned him that he would have to look at them as a juror. The trial court asked R.C. whether he would look at the pictures despite his preference not to do so and commented: "Some people might tell me: I just won't do it. I don't care, Judge." R.C. answered: "I wouldn't say I don't care. But given the fact that I respect the gentleman that-gentlemen that is representing the People, as well as the defendant, and I have heard questions asking people relative to their own feelings, how they would feel, and I wouldn't-if I had a choice, I wouldn't choose me. I wouldn't feel comfortable being a person that would be involved and have somebody's life on the line, and have to look at them and say that I would truly look at them the way he deserves, or the prosecuting attorney deserves, for me to look at those pictures in order to come with an accurate conclusion based on the evidence."

The prosecutor challenged R.C. for cause. After the trial court denied the challenge for cause, and after further questioning of R.C. by defense counsel, the prosecutor indicated he intended to peremptorily challenge R.C. Defense counsel made a motion pursuant to Batson, supra, 476 U.S. 79 and Wheeler, supra, 22 Cal. 3d 258, alleging that the peremptory challenge was based upon R.C.'s race. Defense counsel argued that other than the issue of viewing graphic photographs (which R.C. said he would do if so instructed by the trial court), there was nothing else that would indicate that R.C. would not be fair. The trial court concluded that the defense had established a prima facie case that the prosecutor's peremptory challenge of R.C. was based upon group bias, and it directed the prosecutor to state the reason for his challenge. The prosecutor offered the following reasons for the peremptory challenge: (1) R.C. stated that serving as a juror would be an economic hardship, because he was a realtor and had recently taken out a line of credit to get a new business started, (2) he stated he had been a drug user but was now "quite evangelical in nature," which might rub other jurors the wrong way if R.C. believed that he knew the "the truth" and others did not, and (3) R.C. had expressed concern about looking at graphic pictures.

In denying defendant's Batson-Wheeler motion, the trial court stated: "If this were a challenge for cause situation, it would be much more difficult, because the statement about he would look at them [graphic photographs] but not to the extent necessary raises very serious questions about whether he can discharge his duties. But there's some ambiguity in that. [¶] But this is not a challenge for cause situation. This is a peremptory challenge. And what is really before me is whether the People are exercising this challenge based on race neutral-genuinely entertained race neutral concerns, beliefs, and I do find they are acting in complete good faith in this respect. The concerns that they expressed, that [the prosecutor] expressed, all three of them, provide individually and severally, collectively and severally I should say, provide race neutral reasons for exercising a peremptory challenge." The prosecutor thereafter exercised a peremptory challenge of R.C.

Johnson, 2009 WL 1154220 at *6-7.

9

**United States District Court**
For the Northern District of California

Here it is undisputed that there was a prima facie case and that the prosecutor tendered nondiscriminatory reasons for the strike.  It is the third step,  whether those reasons were pretextual, that is at issue here.  Viewed with the deference required by the AEDPA, the question for this court is whether it was unreasonable in light of the evidence for the state courts to credit the prosecutor's explanations.  See Rice, 546 U.S.  at 338-40.

Prospective juror R.C. was reluctant to view gruesome photographs, and  said "'if I had a choice, I wouldn't choose me' for the jury." Johnson, 2009 WL 1154220 at *7.  It likely would be the prosecution that would introduce photographs of the victim, meaning that a prospective juror such as R.C. who was reluctant to see such pictures would blame the prosecution for forcing him to see them.  And the prosecutor could reasonably be reluctant to leave someone on the jury who was as explicit as was R.C. about not wanting to be on it.  The first ground for the strike was not pretextual.

 The prosecutor's reasoning that R.C.'s strong religious feeling might alienate other jurors was supported by R.C.'s comment that he "'look[ed] at everyone as being either knowing of the truth about Christ or not knowing about the truth,' and that he found it 'bothersome' that some people did not have knowledge of 'the truth.'" Id. at *6.  Because this attitude might cause conflict on the jury, it was not unreasonable for the state courts to credit this reason for the strike.

And the prosecution's explanation that one of the reasons for the strike was R.C.'s concern about a long trial makes sense, because a lengthy trial might be blamed on the prosecution, which had a lengthy case.  It was reasonable for the state courts to find that this reason for the strike was not pretextual.

Finally, R.C. expressed concern about serving on a jury for a long trial because he had taken out a equity line of credit to start a new real estate business.  Id. at *6.  In the direct appeal, petitioner contended that the comparative juror analysis showed the reason to be pretextual.  He does not make that argument here, but because he is pro se the Court will consider it.

United States District Court
For the Northern District of California

Comparative juror analysis -- i.e., determining whether non-challenged jurors possess any of the characteristics on which the prosecution challenged jurors in the protected group -- may tend to prove discrimination at the third <u>Batson</u> step. <u>Miller-El</u>, 545 U.S. at 242-43; <u>Snyder v. Louisiana</u>, 552 U.S. 472, 484-85 (2008). Here, however, the white jurors to whom petitioner seeks to compare R.C. were excused for cause, and thus the prosecution never had an opportunity to strike or pass them. <u>Johnson</u>, 2009 WL 1154220 at *8. Comparative juror analysis thus does not support petitioner's claim.

It was not unreasonable in light of the evidence for the state courts to credit the prosecutor's explanations for striking R.C. <u>See</u> <u>Rice</u>, 546 U.S. at 338-40 (standard).

### B.    Prospective Juror M.E.

The court of appeal set out the background of this claim:

Prospective juror M.E., who worked as a retail clerk for more than 30 years, lived in Richmond, apparently fewer than 15 blocks from the crime scene. She told the trial court that she had recently started taking medication for high blood pressure, and she had not become accustomed to it. She explained, "It doesn't cloud [my thinking], but it kind of-I can be listening and kind of like I'm going to-I haven't got used to the medicine. So I kind of, like I want to go to sleep." When the trial court asked M.E. whether she knew someone named Neal Fiu, she thought the court was referring to a "feud" and responded, "What I thought you meant is the feud they've been having about racism on the jury," an apparent reference to something M.E. had read about in the newspaper.

M.E. expressed concern about whether witnesses might recognize her: "They probably will recognize me because I worked in the five and ten cent store and all these gangs and things, even San Pablo have them, they all kind of intervene in, and they used to hang out in the shopping centers, or things like that." She also explained: "The only problem I have, they tell me that I should have learned Spanish or, you know their language because when they say something, I don't know what they be saying. So that might-If they get up here and say something, make a sign and I don't understand what that is, I might be frightened, you know. Because most people knows me because I worked in the variety store. I call it the five and ten cent store, so I probably done-you know, they probably been in the store. We take money from anybody, you know. Then they say you get tagged. So I think I've been tagged, but I don't worry about it."

M.E. also described changes in her neighborhood: "After they-After they, you know, different-what did he call them? My sister don't like me to say Hispanic because she think I don't like Hispanic, but after older African-American moved out the neighborhood, they're buying their houses. So now we have more Hispanics around us because what we call up on the Hill used to be another call housing called Easter Hill Housing Project. They tore that down. That means they have to find places for people who wanted to stay in the area till they rebuild up there. [¶] So now to me, I said that's when all

the-all the violence looks like it got worse, but it might not. I think it did. It made a big difference in the neighborhood. Plus she don't like for me to say we have more people that came from Mexico, but that's true. You can't get around from saying that, but she doesn't like when you talk that way."

When asked how long she had been retired, M.E. responded, "Well, I don't know if you call it retirement, but I worked-well, I first started-I started in Richmond 1960, downtown Richmond. Then when all the remodeling section, 19-see, that's what I mean the medicine makes me-I can be talking, and then all of a sudden I forget what I'm saying." At one point M.E. apologized for starting to cry when she was talking about the murder of her niece, whose killer was never caught.

The prosecutor stated that he intended to exercise a peremptory challenge as to M.E.[4] Defense counsel made a <u>Batson</u>-<u>Wheeler</u> motion, claiming that although M.E. had a tendency to "go on a tangent," she "didn't say anything that would lead anyone to believe she couldn't be a fair and impartial juror." The trial court disagreed, but it concluded that the defense had established a prima facie case that the prosecutor's challenge was based upon group bias, because one other African-American had been excused and there were only two others left. The prosecutor explained the reasons for his challenge: M.E. appeared confused about the location of the crime even though she lived fewer than 15 blocks from the area; she was familiar with the Eastern Village projects and had a niece who was murdered in the area; she gave conflicting information about whether she had read about defendant's trial in the newspaper; she believed that the court was saying "feud" instead of "Fiu" for a few days; she was upset about the reputation Richmond had in the media; she seemed concerned about Hispanics moving into her neighborhood and changing Richmond; she worried about nodding off, not remembering things from one day to the next, being "tagged" by the witnesses; and not being able to understand the language used by Hispanic witnesses; and M.E.'s answers to questions were "quite long, quite rambling, and covered many areas."

The trial court denied defendant's <u>Batson</u>-<u>Wheeler</u> motion, concluding that the prosecutor sincerely believed the reasons provided, and that the reasons were race neutral and given in good faith. The court also concluded that all the reasons provided by the prosecutor had a basis in fact, and that they jointly and severally justified the exercise of the peremptory challenge. The prosecutor thereafter exercised a peremptory challenge of M.E.

<u>Johnson</u>, 2009 WL 1154220 at *8-10 (footnote in original but renumbered).

Again it is undisputed that there was a prima facie case and that the prosecutor

tendered nondiscriminatory reasons for the strike. It thus is the third step, whether those

reasons were pretextual, that is at issue here.

Many of the prosecutor's reasons for the strike were about M.E.'s mental or physical

---

[4] The prosecutor first stated, outside the presence of the jury, that he was challenging M.E. for cause. The trial court denied the challenge, and the parties proceeded to argue the <u>Batson</u>-<u>Wheeler</u> motion.

limitations (confusion about location of the crime though it was near her, conflicting answers about whether she had read about the crime, mistake of Fiu for "feud," her problem with nodding off as a result of her blood pressure medicine, potential difficulty understanding Hispanic witnesses, and her rambling answers). These are logical reasons not to want a prospective juror on the jury. It was reasonable for the state courts to find that this reason for the strike was not pretextual.

The prosecutor also gave as a reason for the strike that M.E. was familiar with the Eastern Village projects. Because jurors are to base their verdict on the evidence rather than knowledge gained outside the courtroom, this was a logical reason for the strike. That M.E. was concerned about being "tagged" by the witnesses also was a logical reason for the strike, as a juror who was fearful of retaliation or intimidation would be less likely to convict on the evidence.

On the other hand, that M.E.'s niece was murdered in the area of the project is less clearly nonpretextual. Some prosecutors might in the interests of justice wish to avoid a juror who could be disposed to convict for personal reasons, but other prosecutors might consider her a pro-prosecution witness for that very reason. Similar considerations might apply to M.E.'s possible bias against Hispanics.

"After analyzing each of the prosecutor's proffered reasons, our precedent suggests that the court should then step back and evaluate all of the reasons together. The proffer of various faulty reasons and only one or two otherwise adequate reasons, may undermine the prosecutor's credibility to such an extent that a court should sustain a <u>Batson</u> challenge. " <u>Lewis v. Lewis</u>, 321 F.3d 824, 830-31 (9th Cir. 2003). As the above analysis shows, the prosecutor's reasons here were overwhelmingly logical, with only one or two slightly doubtful. At the very least, it was not unreasonable in light of the evidence for the state courts to credit the prosecutor's explanations for striking M.E.

## C.    Prospective Juror F.T.

The court of appeal set out the background of this claim:

The trial court began its questioning of prospective juror F.T. by asking

13

him to tell the court about the three adult children he listed on his juror voir dire questionnaire. F.T. answered, "Is that necessary?" The trial court asked whether F.T. would rather discuss the matter in private, and F.T. answered, "If it's necessary." After a few questions in chambers about F.T.'s children revealed that one was a high school counselor and the other two were in college, the trial court asked why F.T. had been reluctant to disclose this in open court. F.T. then criticized the jury selection process, complaining that "[i]t seems like something is just not quite right with this." He complained that the procedure was taking too long, that he was tired, that he had lost his patience, that the questions had become repetitive, and that he did not understand why jury selection could not be done "ahead of time." When asked what he thought about serving on a jury, F.T. replied, "Nothing I'm looking forward to doing." He later explained, "Don't get me wrong. I'm not saying what you are doing is wrong. I'm not saying the process, per se, is wrong. I'm saying, the way it is set up, it seems to be wrong. In other words, I can see the process happening, but not now. And the Judge just said that Mr. Johnson has to be part of the [jury selection] process. Okay, that's something I didn't know. I didn't realize that. [¶] But it just seems strange that we have to sit through all of this. And like I said, as you continue going over and over and over things, I can see where people are either getting tired or possibly frustrated." F.T. stated on his juror questionnaire that he had worked for the postal service for "25" (presumably, years), and he told the trial court that he drove a route in Oakland.

The prosecutor exercised a peremptory challenge as to F.T., and defendant's attorney made a motion pursuant to Batson-Wheeler. The trial court found that the defense had established a prima facie case that the prosecutor's peremptory challenge was discriminatory and asked the prosecutor to provide the reason for the challenge. The prosecutor stated: "Number one, he works for the Postal Service. There's a term that's used widely in society, called 'going Postal.' And we started to see a bit of a glimpse of that with Mr. T[.] here." The prosecutor said that F.T. did not want to "go along with the system"; that F.T. appeared to be "very frustrated, very outspoken"; that he (the prosecutor) had concerns F.T. would not blend in with other jurors; and that when asked whether he could put aside his frustration, F.T. said "probably" and accused the prosecutor of "picking" when he asked follow-up questions.

Defendant's counsel objected to the prosecutor's characterization of F.T.'s answers and argued that the reasons given were not race neutral. The trial court denied the Batson-Wheeler motion. It focused on F.T.'s request to discuss his answers about his children in chambers and said that "all he was doing was blowing off steam. He was-he was just pissed off at the length of time that it was taking to select jurors, and he was assuming this attitude towards the whole process that in [sic] indicates that there's serious questions about his temperament. [¶] These are the issues that were raised by [the prosecutor]. They seem to me to be-to have nothing to do with race. They simply have to do with his attitude towards this matter, and his temperament and whether he is an appropriate juror, the kind of person who is going to work with 12 other-with 11 other individuals in reaching a decision." The court also concluded that F.T.'s "demeanor was consistent with [the prosecutor's] characterization of a person that has an explosive temperament." The trial court permitted the peremptory challenge of F.T.

Johnson, 2009 WL 1154220 at *11-12.

The prosecutor's reasons for striking F.T. can be summarized as being concern about

14

his temperament.  His answers amply support that concern, one that was obviously shared by the trial court.  It was not unreasonable in light of the evidence for the state courts to credit the prosecutor's explanations for striking F.T.

### 3.   Substantial Evidence – Murder Conviction

Petitioner alleges that his conviction was not supported by substantial evidence.  The prosecution proceeded on two theories, that petitioner was guilty of deliberate and premeditated murder, or that he aided and abetted an assault with force likely to create great bodily injury, the natural and probable consequence of which was first degree murder.  Id. at *16.

The Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."  In re Winship, 397 U.S. 358, 364 (1970).  A state prisoner who alleges that the evidence in support of his state conviction cannot be fairly characterized as sufficient to have led a rational trier of fact to find guilt beyond a reasonable doubt therefore states a constitutional claim, see Jackson v. Virginia, 443 U.S. 307, 321 (1979), which, if proven, entitles him to federal habeas relief, see id. at 324.  A federal court reviewing collaterally a state court conviction does not determine whether it is satisfied that the evidence established guilt beyond a reasonable doubt.  Payne v. Borg, 982 F.2d 335, 338 (9th Cir. 1992).  The federal court "determines only whether, 'after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"  Id. (quoting Jackson, 443 U.S. at 319).  Deference is owed to the trier of fact, and "a reviewing court 'faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'"  Wright v. West, 505 U.S. 277, 296-97 (1992) (quoting Jackson, 443 U.S. at 326).

The court of appeal rejected the claim as to deliberate and premeditated murder:

a. Planning

15

When defendant arrived at the home of Fiu (who associated with defendant frequently during the summer of 2003), he spoke with Juan, Fiu, and the teenage gang members who had beaten Espinoza; said he wanted to kill the victim; went with the teenagers to the victim and kicked him, stabbed him, and placed a milk crate on his neck so that he could jump on it;[5] and directed one of the teenagers to stab the victim. At one point defendant asked for a gun so that he could kill Espinoza, but no one in the group had one to give to him at the time. Based on this evidence, the jury could reasonably "infer that defendant 'considered the possibility of murder in advance' and intended to kill. [Citations.]" (People v. Young, supra, 34 Cal. 4th at p. 1183.) Planning activity that takes place over a short period of time is sufficient to find premeditation. (People v. Sanchez, supra, 12 Cal. 4th at p. 34 [deliberation shown where man struck his father in hallway, then left to get a kitchen knife to carry out plan to kill him].) " ' " 'The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly.' [Citations.]" ' [Citation.]" (Young, supra, 34 Cal. 4th at p. 1182.) Although defendant's attack on Espinoza apparently took place shortly after defendant learned of the victim's whereabouts, defendant's statement that he wanted to kill Espinoza after conferring with those who had beaten Espinoza previously was sufficient to show reflection on defendant's part. (Ibid.) There was substantial evidence of planning, the most important prong of the Anderson test.[6] (People v. Alcala (1984) 36 Cal. 3d 604, 627.)

b. Motive

We disagree with defendant's argument that there was no plausible theory of his motive in killing Espinoza. As the trial court observed in denying defendant's motion for a new trial, there was substantial evidence that defendant and others trafficked drugs on the corner near Fiu's house, and that defendant urged the teenaged SOD members to finish off Espinoza after he was told that the victim had entered their territory and identified himself as being from another gang. Witnesses described defendant as belonging to a "15th Street" gang whose members sold drugs in the neighborhood (including on the street corner where the murder took place), and that defendant himself had been seen on that corner selling drugs. When defendant arrived the night of the murder, he first spoke with Juan, who also was linked with the same gang. Although defendant was not a member of SOD, jurors found that he acted for the benefit of, at the direction of, or in association with that gang, with the

---

[5] We recognize that the jury found not true allegations that defendant personally used a knife and a milk crate; however, there was evidence supporting these allegations. Moreover, the jury may have rejected the enhancement as to the milk crate based on a finding that it was not a "deadly or dangerous weapon" (§ 12022, subd. (b)(1)), not because there was insufficient evidence that defendant personally used it in the attack on the victim.

[6] Defendant refers in passing to his "supposed drunken" participation in the second attack on Espinoza, but does not direct this court to any evidence that he was in fact intoxicated during the attack. The jury was correctly instructed that if the evidence showed that defendant was intoxicated at the time of the crime, it could consider that fact in deciding whether defendant had the required specific intent and/or mental state to commit the charged crimes. (CALJIC No. 4.21.1; § 22, subd. (b).) We see no reason to set aside the jury's finding that defendant acted with the requisite mental state. (People v. Pickens (1969) 269 Cal. App. 2d 844, 852 [jury's resolution regarding effect of intoxication conclusive on appeal].)

16

specific intent to promote, further, or assist gang members' criminal conduct (§ 186.22, subd. (b)), conduct that gang members testified they undertook because they perceived the victim's throwing an "EHL" gang sign as a challenge. Defendant asked whether the victim was "EHL" before attacking him. Based on all this evidence, the jury could reasonably conclude that defendant was motivated by a desire to retaliate against a gang member entering rival territory.

c. Manner of killing

As for whether the manner of killing could lead the jury to reasonably infer that the wounds were deliberately calculated to result in death (<u>Anderson</u>, <u>supra</u>, 70 Cal. 2d at ¶. 33-34), witnesses testified that defendant repeatedly hit and kicked the unconscious victim, who was lying helpless on the ground unable to protect himself, and that defendant directed Joey O. to stab the victim. They also testified that defendant himself stabbed the victim, and that he put a milk crate on the victim's neck and jumped on the crate.

Especially in light of the fact that there was no sign of a struggle by the victim after defendant joined the attack on him (<u>People v. Stewart</u> (2004) 33 Cal. 4th 425, 495), the evidence regarding the manner of killing plainly supports a finding of premeditation and deliberation. Substantial evidence supports the jury's finding of first degree murder.

<u>Johnson</u>, 2009 WL 1154220 at *14-15 (footnotes in original but renumbered).

Petitioner contends in the petition that "appellant's first-degree murder conviction is no more supported by substantial evidence of actual premeditation and deliberation [citation omitted] than his codefendant (convicted only of second-degree murder)." Pet. at 9. As respondent points out, however, former codefendant Fiu's conduct, for which he was convicted of second degree murder in a separate trial, was quite different from petitioner's. Fiu participated in the initial group beating of the victim, which the victim survived, but petitioner then attacked the incapacitated victim a second time, either killing him himself or participating with a cohort in killing him. There was a clear difference between the case against Fiu and that against petitioner.

The evidence, as set out by the court of appeal above, was more than sufficient to support the verdict on a deliberate and premeditated murder theory.

"The prosecution also proceeded under the theory that defendant aided and abetter Espinoza's murder because he encouraged or facilitated it." <u>Johnson</u>, 2009 WL 1154220 at *15.

[J]urors heard evidence that when defendant arrived after the first attack on the victim, he spoke with those who had participated in the first beating, went with

17

**United States District Court**
For the Northern District of California

them to the unconscious victim and began hitting and kicking the victim, and also stabbed him. Defendant also asked for a gun so he could kill the victim. Jurors also heard evidence that defendant directed Joey O. to stab the victim, and that defendant got a milk crate that was placed on the victim's neck so that defendant could jump on it. This is sufficient evidence from which the jury could conclude that it was reasonably foreseeable that premeditated, first degree murder would be the natural and probable consequence of the second attack on Espinoza..

Id. at *16.

This was more than sufficient evidence to support the verdict on an aiding and abetting theory.

### 4.    **Substantial Evidence – Gang Enhancement**

In his petition, petitioner alleges that there was insufficient evidence to support the gang enchantment and that the trial court instructed on an "inapplicable gang predicate offense."  Pet. at 10.

Petitioner says in the petition's "supporting facts" section for this claim that "the gang enhancement findings are unsupported by substantial evidence of coherent intent to aid *someone else's* [italics in original] gang [citation omitted], the primary activity element [citation omitted], or the washout periods for pattern priors [citation omitted]."  Pet. at 10. This claim was raised on direct appeal; in the absence of any other explanation of it, the Court will presume that petitioner intended to present the same claim here.

The court of appeal explained the background:

Gang enhancements were alleged, pursuant to section 186.22, subdivision (b) in count 1 (murder) and in count 2 (conspiracy). The gang enhancement required proof that defendant committed the crimes "for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members." (§ 186 .22, subd. (b); see also People v. Gardeley (1996) 14 Cal. 4th 605, 616-617.) The statute defines "criminal street gang" as "any ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its primary activities" the commission of certain specified criminal acts, and that engages through its members in a "pattern of criminal gang activity."
(§ 186.22, subd. (f).) A gang engages in a " 'pattern of criminal gang activity' " when its members participate in two or more specified criminal offenses ("predicate offenses") committed within a certain time frame and "on separate occasions, or by two or more persons." (§ 186.22, subd. (e); People v. Gardeley, supra, 14 Cal. 4th at p. 610, fn. 1 ["'predicate offenses' "refers to crimes that constitute " 'pattern of criminal gang activity'"'].)

United States District Court
For the Northern District of California

1
2
3
4
5
6

Russ Miller, a deputy probation officer in Contra Costa County, testified as an expert in Southeast Asian gangs in the western part of the county. According to Miller, SOD has approximately 100 to 200 members, and its primary activities include automobile thefts, residential burglaries, firearm offenses, murders, and assaults. Miller also testified that SOD is divided into "generations" by age: the founding members of the gang; the "first generation" members, who are in their late 20s and 30s; "second generation" members; "third generation" members, with whom Miller mostly worked; and "fourth generation" members, who tend to be in junior high and high school. Younger generation SOD members commit crimes to benefit the gang and to impress older members of the gang.

7
8
9
10
11
12

The parties entered into a stipulation that the following crimes and convictions took place: (1) Salali Vongsy's conviction of two counts of assault with a semiautomatic firearm (§ 245, subd. (b)) (crime occurred on July 4, 2000, conviction on Jan. 13, 2004), (2) Deng Phethlivay's conviction of assault with a semiautomatic firearm (§ 245, subd. (b)) (crime occurred Aug. 15, 1999, conviction on May 26, 2000), and (3) Vasnu Chanthaouzngsy's conviction of possession of an assault weapon (§ 12280, subd. (b)) (crime occurred May 17, 2003, conviction on July 22, 2004).[7] The trial court instructed the jury that these three offenses alone[8] could be relied on as the predicate offenses to establish the required pattern of criminal activity.

Johnson, 2009 WL 1154220 at *16 (footnotes in original but renumbered).

13
14
15
16
17
18
19
20
21
22

Petitioner argued in the court of appeal that "there was insufficient evidence that he committed the charged offenses with the requisite specific intent" to benefit a street gang, "because he was not a member of SOD and because any motive to assist SOD members was speculative." Id. at *17. The court held that "it is settled that one need not be a current, active member of a gang in order to be convicted of committing a crime 'for the benefit of, at the direction of, or in association with' (§ 186.22, subd. (b)(1)) that gang. (People v. Villalobos (2006) 145 Cal. App. 4th 310, 322 [affirming conviction of woman who acted in concert with known gang members]; In re Ramon T. (1997) 57 Cal. App. 4th 201, 206.)." Johnson, 2009 WL 1154220 at *17 (brackets in original). This holding is binding on this

23

24
25
26

[7] The trial court took judicial notice of these same crimes in Fiu's trial, although the defendant in the third crime was identified as Chantha Duoangsy. (People v. Fiu, supra, 165 Cal. App. 4th at pp. 387-388.) The charged crimes, the dates on which they occurred, and the conviction dates were otherwise identical. (Ibid.)

27
28

[8] "The currently charged offenses may also be considered as predicate offenses (People v. Loeun (1997) 17 Cal. 4th 1, 10 [ ]; People v. Gardeley [supra] 14 Cal. 4th at pp. 624-626), but the trial court did not so instruct the jury." (People v. Fiu, supra, 165 Cal. App. 4th at p. 387, fn. 32.)

19

United States District Court
For the Northern District of California

Court.  See Bradshaw v. Richey, 546 U.S. 74, 76 (2005) (state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus)   Thus that petitioner was not a member of SOD does not matter.

The court of appeal summarized the evidence that petitioner intended to assist SOD members:

> Defendant spoke with SOD member Fiu and the four teenaged SOD members who had previously beaten up Espinoza before he himself attacked the victim. Danny G. testified that the beating did not have anything to do with drugs, that "it was more like a gang thing." (He also testified that he was "not too sure why" the group started kicking Espinoza again after defendant arrived.) Danny G. testified that defendant asked whether Espinoza was "EHL," the gang that Espinoza identified before the fight began. The niece of Fiu's wife testified that when defendant went into the house to wash his hands the night of the murder, he referred to a fight with Easter Hill (which other witnesses testified is also known as EHL). Jurors could conclude based on this evidence that defendant specifically intended to further gang conduct by attacking Espinoza.

Johnson, 2009 WL 1154220 at *18.  This evidence is sufficient to satisfy the federal Jackson standard.  See Jackson, 443 U.S. at 319 (standard is whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.").

Petitioner also argued in the court of appeal that there was insufficient evidence to support the "primary activity element" of the statute.  Miller, the gang expert, testified about gangs in the western part of the county and, in particular, the SOD.  He described the SOD's primary activities as "a lot of auto thefts, residential burglaries, and various firearm offenses. There have been murders, assaults, deadly weapons, things of that nature."  Johnson, 2009 WL 1154220 at *16.  When asked if those were the "primary activities of the gang, Miller responded:  'I think so, yes.'"  Id. (italics in original).

Petitioner claimed on appeal that  Miller 's opinion regarding the primary activities of the SOD was "equivocal" and that the basis for his opinion was insufficient. Id..  The court of appeal pointed out that Miller testified that he

> had spoken with (1) more than 100 members of southeast Asian gangs, (2) parents of gang members, (3) gang members who do not belong to Southeast Asian gangs, and (4) other community members about gang-related activities. He had previously supervised three people charged in Espinoza's beating death

United States District Court
For the Northern District of California

1

2

3

4

5

(Sammy V., Brandon V., and Juan Cervantes) as a probation officer. Based on this experience, Miller testified that SOD members would participate in fights after rival gang members flashed gang signs because "that's what they are expected to do," that younger members of the gang commit crimes to benefit the gang and prove themselves, that some SOD members are known to kill when someone "crosses them," and that his opinion that SOD members engage in violent activities was based in part on allegations that Fiu's brother was involved in a shooting at the home of a rival gang member, as well as SOD involvement in another shooting in October 2003."

6   Johnson, 2009 WL 1154220 at *18.  This was more than sufficient evidence under the

7   Jackson standard.

8        Petitioner also claims that there is insufficient evidence of qualifying predicate gang

9   offenses.  Penal Code section 186.22(e) defines a "pattern of criminal gang activity" as "the

10  commission of, attempted commission of, conspiracy to commit, or solicitation of, sustained

11  juvenile petition for, or conviction of two or more of [specific enumerated] offenses,

12  provided at least one of these offenses occurred after the effective date of this chapter and the

13  last of those offenses occurred within three years after a prior offense, and the offenses were

14  committed on separate occasions, or by two or more persons."  Cal. Penal Code § 186.22(e).

15  Petitioner's argument on direct appeal was that the predicate offenses had to have been

16  within three years of the offense being tried, rather than within three years of each other.

17  Johnson, 2009 WL 1154220 at *19.  The court of appeal held that this is incorrect under

18  California law.  Id.  As it is clear that the predicate offenses occurred within three years of

19  each other (petitioner does not argue that they did not occur), the evidence was sufficient.[9]

20       **5.    Admission of Evidence**

21       Petitioner alleges that his due process rights were violated by the trial court's

22  admission of evidence of his gang affiliation and his drug dealing.  He also asserts that these

23  errors were cumulatively a violation of his due process right to a fair trial.

24  _____

25       [9] The Attorney General conceded on direct appeal that the trial court should not have
    instructed the jury that it could consider as a predicate offense a gang member's conviction

26  for possession of an assault weapon, because it is not one of the enumerated predicate
    offenses in the statute.  Johnson, 2009 WL 1154220 at *18.  The court of appeal noted that

27  there remained two qualifying predicate offenses, so the error was harmless.  Id.  The error
    was purely one of state law, and because there was sufficient evidence of two predicate

28  offenses, does not affect the constitutional question.

United States District Court
For the Northern District of California

A federal habeas court's review of claimed error in the admission of evidence is limited. A state court's evidentiary ruling is not subject to federal habeas review unless the ruling violates federal law, either by infringing upon a specific federal constitutional or statutory provision or by depriving the defendant of the fundamentally fair trial guaranteed by due process. Pulley v. Harris, 465 U.S. 37, 41 (1984). The due process inquiry in federal habeas review is whether the admission of evidence was arbitrary or so prejudicial that it rendered the trial fundamentally unfair. Walters v. Maass, 45 F.3d 1355, 1357 (9th Cir. 1995). But only if there are no permissible inferences that the jury could draw from the evidence can its admission violate due process. Jammal v. Van de Kamp, 926 F.2d 918, 920 (9th Cir. 1991). And the writ may not issue unless the error had a "substantial and injurious effect or influence in determining the jury's verdict." Dillard v. Roe, 244 F.3d 758, 769-70 (2001) (citing Brecht v. Abrahamson, 507 U.S. 619, 637 (1993)). A reviewing court must determine independently whether a trial error had a substantial and injurious effect, without consideration of burdens of proof. Mancuso v. Olivarez, 292 F.3d 939, 950 n.4 (9th Cir. 2002).

### A.    Gang Affiliation

Defendant moved before trial to exclude evidence of the existence of a "15th Street" gang or that he was affiliated with such a gang.[10] Before Fiu's trial (and when defendant and Fiu were still to be tried together), the trial court stated that it agreed that evidence of defendant's association with a 15th Street gang was relevant to show motive. The prosecutor represented, however, that he intended to show that only Juan (and not defendant) was associated with the gang; the court stated it would hold a hearing pursuant to Evidence Code section 402[11] regarding Juan's possible involvement with the gang before witnesses were permitted to testify about the association.

The trial court revisited the issue (after Fiu's trial) in connection with defendant's motion for a mistrial based upon the trial court asking prospective jurors in defendant's case whether they had any knowledge about several

---

[10] During hearings on the issue, the prosecutor indicated that he also wanted to introduce evidence that defendant belonged to the "Cold Gunners" gang. The trial court excluded evidence of defendant's supposed affiliation with that gang, because the prosecution did not show that that it was related to the murder of Espinoza.

[11] Evidence Code section 402 provides that the trial court shall determine the existence of a preliminary fact where the fact is disputed.

22

United States District Court

For the Northern District of California

gangs, including the "1500 Gang." Before denying defendant's motion, the trial court explained that Danny G. and Sammy V. had testified about the "1500 Gang" during Fiu's trial. The court stated that Danny G. had testified during Fiu's trial that " 'a bunch of drug dealers' " known as " 'the 1500 Gang' " (most of whom were Black) hung out on the corner of 15th Street and Maine Avenue, where the murder took place. Danny G. also testified at Fiu's trial that Juan was connected with the group, that Juan was the person who "flagged down Ezekiel" the night of the murder, and that there were problems between the " '1500 boys' " and EHL (the gang Espinoza identified before he was attacked). The trial court ruled that Danny G. would be permitted in defendant's trial to testify as to his personal observations (but not opinions) about whether "the 15th Street Boys or gang" existed and whether the group had problems with EHL,[12] and that it would also permit the introduction of evidence of defendant's tattoos, from which a reasonable inference could be drawn that defendant was associated with the gang in question. All this was relevant to defendant's alleged motive, the trial court concluded.

Danny G. testified at trial that defendant said he belonged to "1500 or 15th Street," and that he saw defendant hang out with "1500 Boys."[13] According to Danny G., the 1500 Boys were Hispanic and Black. Danny G. also testified that he had seen Juan hang out with people on "15th Street" or "1500" in the first half of 2003, and that it was Juan who first approached defendant when he arrived the night of the murder. Danny G. saw Juan and others in the group involved in hand-to-hand-transactions in the area of the murder scene in the early summer of 2003.

Sammy V. testified that a group that sang a song about "the 15 and Maine Boys" also hung out on the corner in Richmond where Fiu's house is located, and that defendant appeared to be a part of the group. Sammy V. also testified that Juan was a member of SOD, and that he also appeared to be friends with members of the 15th Street gang. Javi (Juan's cousin) likewise appeared to be connected to 15th Street. The niece of Fiu's wife testified that there was a group of guys that hung out at the corner where Fiu's house is located, and that Juan and Javi hung around with them.

The trial court admitted pictures of defendant showing two tattoos apparently connected to the group witnesses described: one tattoo on his arm said "15NBK," and the other tattoo on his arm depicted a tombstone with "R.I.P." above it and "1500" below it.

Johnson, 2209 WL 1154220 at *20-21 (footnotes in original but renumbered).

The court of appeal held that admission of the evidence did not violate California law, because the evidence was relevant to motive, the trial court sufficiently scrutinized the

---

[12] During trial, the prosecutor clarified that he was not going to ask Danny G. about conflict between 15th Street and EHL, because Danny G. told him he did not witness such a conflict.

[13] Witnesses who testified about the group generally did not refer to it as a "gang." However, we accept for purposes of our analysis that the implication of the witnesses' testimony was that they were referring to a gang.

evidence before admitting it, and the prejudicial effect did not outweigh the probative value. Id. at *21-22. It also held that "[b]ecause we conclude that the trial court did not err in admitting this testimony, we need not address whether any errors amounted to a violation of defendant's due process rights or deprived him of his right to a fair trial." Id. at *22. It thus did not reach the question presented here, whether admission of the evidence violated due process. Because the claim was not adjudicated on the merits in state court, there is nothing to which to apply AEDPA deference, and the Court will consider the claim de novo. See Williams v. Cavazos, 646 F.3d 626, 637-39 (9th Cir. 2011) (when it is clear that claim was not adjudicated on the merits in state court review is de novo), cert. granted, No. 11-465, 2012 WL 104740 (U.S. Jan. 13, 2012).

Although admission of the evidence did not violate state law, that is not conclusive on whether there was a due process violation. See Jammal, 926 F.2d at 919 (state procedural and evidentiary rules may countenance processes that do not comport with fundamental fairness). But here there patently were "permissible inferences that the jury may draw from the evidence," id. at 920, for instance that the motive for the crime was gang rivalry, so its admission was not arbitrary and there could be no due process violation. Petitioner's due process rights were not violated by admission of the gang evidence.

## B.   Drug Dealing

Petitioner also argues evidence showing he sold drugs should not have been admitted and "created a substantial risk that appellant was convicted of murder on the basis of bad character and other irrelevant and inflammatory misconduct, rather than the evidence of the charged offenses … . Appellant deserved to be tried on the equivocal evidence of his unexplained involvement in a respect attack by another gang, not because he was a gang-banging drug-dealer in his own right." Pet.13, 14.

Evidence of drug-dealing was introduced at petitioner's trial to support count two, an allegation that the petitioner conspired with Fiu, Danny G., Juan and others to illegally sell narcotics. Johnson at *22. The court of appeal summarized the evidence:

Various witnesses testified about drug sales by defendant. When Danny

24

United States District Court
For the Northern District of California

G. was asked whether he saw defendant involved in any hand-to-hand transactions in the first half of 2003, Danny G. testified, "I would see him go up to cars, but I don't know if he sold anything or not, but yeah." He testified that he saw defendant make hand-to-hand transactions, and that at least once he saw defendant go to a trash can in Fiu's yard that contained drugs. Sammy V. likewise testified that he saw defendant with "rocks" in his mouth that appeared to be drugs, that he saw defendant sell drugs in the neighborhood, and that he saw defendant go inside Fiu's house with drugs and cut up drugs. Fiu's wife testified, in response to defense counsel's questioning, that she knew "more or less" that defendant sold marijuana in the neighborhood. The prosecutor also characterized defendant as a drug dealer during his opening statement and closing argument.

Johnson, 2009 WL 1154220 at *23 n. 33.

Petitioner argues here, as in the court of appeal, that because the jury did not convict on the conspiracy count ("this story evaporated"), evidence of drug-dealing was "irrelevant and at least tangential and unduly prejudicial," and should not have been admitted.  The court of appeal addressed this argument as follows:

> Defendant's main argument is that the prosecution's "drug deal theory . . . evaporated during trial," noting that the jury declined to convict him of conspiracy to sell narcotics, and that the trial court likewise "rejected the drug allegations." In fact, although the trial court agreed that the evidence did not support the prosecutor's original theory that the beating was the result of a bad drug deal, the court thought there was "significant evidence" that defendant and other people sold drugs on the street corner where the murder took place, and that Johnson was told that an "outsider" had come into "their territory." In light of the fact that evidence of defendant's drug sales were relevant to demonstrate this theory that defendant was protecting his territory, we cannot conclude that the trial court erred in admitting the evidence.

Id. at *23.  There thus was a  permissible inference that the jury could draw frm the evidence, namely that petitioner was protecting his territory, so its admission was not arbitrary and there could be no due process violation.  See Jammal, 926 F.2d at 920 (only if there are no permissible inferences that the jury could draw from the evidence can its admission violate due process).

### C.    Cumulative Effect

Petitioner argues that his case is one in which the cumulative effect of the trial court's purported errors in admitting evidence of his gang affiliation and drug dealing caused "gross unfairness" and deprived him of due process.  Pet. at 15.

Where there has been no constitutional error, nothing can accumulate to the level of a

1  constitutional violation.  Mancuso v. Olivarez, 292 F.3d 939, 957 (9th Cir. 2002); Rupe v.

2  Wood, 93 F.3d 1434, 1445 (9th Cir. 1996).  This claim is without merit.

3       **6.    Photo Array**

4       Petitioner alleges that a police photo array was suggestive, tainting a witness'

5  identification of him.

6       The police showed Maria S. eight photographs depicting people who police thought

7  might have been involved in the murder with which petitioner was charged, only one of

8  whom (the petitioner) was African-American.   This process, the petitioner argues,

9  "cemented a poor identification in her mind" which she relied upon at trial and which the

10  prosecution used as "important *independent* corroboration of the suspect accomplice claims

11  of appellant's involvement in the second attack." Pet. at 16 (italics in original).

12       The court of appeal provides the background:

13       Danny G.'s mother, Maria S., testified that on the night of the murder,
     Danny G., Sammy V., Joey O., and Brandon V. came to her house with blood

14  on their clothing. They arrived at night when she was lying down to sleep, and
     she did not want to let them in; they somehow entered through a window.

15  Maria S. saw the four teenagers from a second-story window, along with
     defendant, who was dropping them off.[14]  The teenagers all had blood on their

16  fists and clothes. Maria S. testified that she had not seen defendant before that
     night, and that she did not see him again in person until she testified at his

17  trial.[15]  Maria S. spoke with Danny G. the day after he arrived home with his
     friends, and he told her that "the [B]lack fellow, the one [Danny G.] brought to

18  my house" stabbed the victim.

19       On August 26, 2003, Detective Manjit Sappal interviewed Maria S.
     (through an interpreter) in connection with the murder investigation. One of his

20  first questions was what happened when Danny G. went to her house the night
     of the murder. The translator told Sappal that Maria S. told him "[i]t was four

21  of them and her son which totaled five. Brandon, Sammy. Okay." The
     translator did not convey that Maria S. had seen an African-American with the

22  teenagers.

23

---

24       [14] Maria S. was not asked any questions at trial about the lighting when she looked out
     her window, or how long she was able to view defendant. She testified that her son "brought

25  [defendant] and the boys to my house," and that they were "down there," meaning outside
     her house trying to get in. She saw the four teenagers the next morning, but she did not

26  testify that defendant was with them.

27       [15] Maria S. first testified that she did not recognize defendant in the courtroom; later

28  she identified him as the person she saw in a photograph that police previously had shown to
     her.

26

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

After a few more questions, Sappal told the translator, "Tell her I'm gonna show her some photos. And see if she recognizes any of them. And if she does, tell us who they are." Maria S. was then shown eight photographs depicting seven people (including defendant) who police thought may have been involved in the murder. A videotape[16] of Maria S. viewing the pictures, which was played for the jury, shows that Maria S. first identified "Sammy" (Sammy V.) as being in one of the pictures, and immediately thereafter pointed at a picture of defendant. The interpreter translated that Maria S. said, "They're saying that a [B]lack male was the one that killed him." The detective and the interpreter then had the following exchange:

"THE INTERPRETER: She's saying that's the guy that finished the victim off at the end.

"DETECTIVE: Does she know his name?

"THE INTERPRETER: (After translation) So she's saying that days later this guy came to pick up her son. And her son said, 'Hey, mom, don't say nothing but this is the guy that finished the guy off .' And she knows that this guy was detained and I guess was released or something like that. That's what she knows from her son."[17]   Maria S. next identified Brandon V. and Joey O. in pictures shown to her; she also recognized Javi as "the brother of Sammy" and Fiu as a Samoan whose name she did not know.[18]   The photograph of defendant was the only picture of an African-American man shown to Maria S., apparently because no other African-American was suspected of being involved in the murder.

Defendant sought to preclude the introduction of evidence that Maria S. identified his photograph, and to preclude any subsequent in-court identification of defendant, arguing that the photographic identification procedure was unduly suggestive in violation of defendant's due process rights. The trial court denied defendant's motion, stating, "This is not a scenario, the typical scenario where a person is talking about someone having committed a crime, and then he or she is shown a photograph, a single photograph and asked to-whether that's the person who committed the crime. This isn't that kind of scenario at all. [¶] In fact, what happened here is relatively early on in the interview, and the police, one of the detectives opened up a photo [ sic ] with a good number of photographs and said that he wanted to show her some photographs to see if she recognizes any of them. She immediately pointed to one of the photographs and said that she recognized that the individual as the person who had come to pick up her son, and that when he did so, her son told her that was the fellow who had finished off the alleged victim in this case,

---

[16] The videotape was not included in the record on appeal but was subsequently transferred to this court for review. (Cal. Rules of Court, rule 8.224(d).)

[17] Danny G. testified that he told his mother that "a [B]lack guy" stabbed the victim, but that he did not think he ever pointed out defendant to his mother. Maria S. testified before the grand jury that no African-American man came by her house to visit Danny G.

[18] Maria S. also identified a man who police initially thought was involved in the murder; police later concluded that he was not, in fact, involved.

27

United States District Court
For the Northern District of California

1  who had killed the alleged victim in this case. It wasn't again they were simply
2  showing a number of photographs and said, 'Do you recognize any of them?' It
   was as nonsuggestive of any approach that I can think of. The only thing that
3  arguably makes it suggestive is it appears that this is the photograph-of all
   these photographs, only the one of Mr. Johnson involved an
4  African[-]American, but it isn't a situation where they were asking us, where
   she testified an African-American did something to me or was present at some
5  event, and then they pull out a picture of an African-American and say this is
   him, isn't it? Or is this him? It wasn't that scenario at all. It's a scenario where
6  they said here's a bunch of photographs. They hadn't talked about finishing him
   off or anything at all. They didn't suggest to her to recognize him in what
7  context or otherwise. [¶] The totality of the evidence is such that I can not find
   as a matter of law that the identification during the course of the interview was
8  the product of an impermissible suggestion, and, therefore, the People will be
   allowed to introduce evidence, and will also be allowed to ask her if she can
   identify Mr. Johnson here in this courtroom, if they want to."

9

10         After Maria S. testified, defendant's counsel learned "in discovery" that
   a different officer had spoken with Maria S. before her interview at the police
11  station, that she had told that officer that it was an unidentified "[B]lack male
   adult" who had stabbed the victim, and that this information was conveyed to
12  Sappal before he interviewed Maria S. Defendant moved for a mistrial, arguing
   that the trial court's previous ruling admitting Maria S.'s testimony was based
13  on the fact that she had not mentioned the involvement of an African-American
   man before she was shown a picture of defendant. The trial court denied the
14  motion, stating, "I didn't say it was a situation where she didn't-hadn't heard
   from somebody that a [B]lack male may have been involved.... [¶] Here they
15  simply threw out a bunch of photographs on the table, and simply said: You
   recognize-do you recognize any of these people? Not: Is this the [B]lack man
16  who committed the crime? Do you recognize any of these people?" The court
   added, "[When I originally ruled on this, I was working on the assumption that
17  she had received some information from her son that a [B]lack man was
   involved." No additional evidence regarding the photographic lineup was
   presented to the jury.
18

   Johnson, 2009 WL 1154220 at *24-25 (footnotes in original but renumbered).
19

20         The court of appeal held that the photo array was not "unduly" suggestive.  Id. at *26.

21  It also held, in a footnote, that the identification at trial was reliable.  Id.

22         Discussing the due process implications of  unnecessarily suggestive identifications,

   the Supreme Court recently said:
23

24         The Constitution, our decisions indicate, protects a defendant against a
   conviction based on evidence of questionable reliability, not by prohibiting
25  introduction of the evidence, but by affording the defendant means to persuade
   the jury that the evidence should be discounted as unworthy of credit.
26  Constitutional safeguards available to defendants to counter the State's
   evidence include the Sixth Amendment rights to counsel, Gideon v.
27  Wainwright, 372 U.S. 335, 343–345 (1963); compulsory process, Taylor v.
   Illinois, 484 U.S. 400, 408–409 (1988); and confrontation plus
28  cross-examination of witnesses, Delaware v. Fensterer, 474 U.S. 15, 18–20
   (1985) (per curiam). Apart from these guarantees, we have recognized, state

28

1    and federal statutes and rules ordinarily govern the admissibility of evidence,
2    and juries are assigned the task of determining the reliability of the evidence
     presented at trial. See Kansas v. Ventris, 556 U.S. 586, 594, n. * (2009) ("Our
3    legal system ... is built on the premise that it is the province of the jury to
     weigh the credibility of competing witnesses."). Only when evidence "is so
4    extremely unfair that its admission violates fundamental conceptions of
     justice," Dowling v. United States, 493 U.S. 342, 352 (1990) (internal
5    quotation marks omitted), have we imposed a constraint tied to the Due Process
     Clause. See, e.g., Napue v. Illinois, 360 U.S. 264, 269 (1959) (Due process
6    prohibits the State's "knowin[g] use [of] false evidence," because such use
     violates "any concept of ordered liberty.").

7    Perry v. New Hampshire, 132 S. Ct. 716, 723 (2012).

8            The Court summarized its decisions thus:

9            Synthesizing previous decisions, we set forth in Neil v. Biggers, 409
     U.S. 188 (1972), and reiterated in Manson v. Brathwaite, 432 U.S. 98 (1977),
10   the approach appropriately used to determine whether the Due Process Clause
     requires suppression of an eyewitness identification tainted by police
11   arrangement. The Court emphasized, first, that due process concerns arise only
     when law enforcement officers use an identification procedure that is both
12   suggestive and unnecessary. Id., at 107, 109; Biggers, 409 U.S., at 198. Even
     when the police use such a procedure, the Court next said, suppression of the
13   resulting identification is not the inevitable consequence. Brathwaite, 432 U.S.,
     at 112–113; Biggers, 409 U.S., at 198–199.

14

15           A rule requiring automatic exclusion, the Court reasoned, would "g[o]
     too far," for it would "kee[p] evidence from the jury that is reliable and
16   relevant," and "may result, on occasion, in the guilty going free." Brathwaite,
     432 U.S., at 112; see id., at 113 (when an "identification is reliable despite an
17   unnecessarily suggestive [police] identification procedure," automatic
     exclusion "is a Draconian sanction," one "that may frustrate rather than
18   promote justice").

19           Instead of mandating a per se exclusionary rule, the Court held that the
     Due Process Clause requires courts to assess, on a case-by-case basis, whether
20   improper police conduct created a "substantial likelihood of misidentification."
     Biggers, 409 U.S., at 201; see Brathwaite, 432 U.S., at 116. "[R]eliability [of
21   the eyewitness identification] is the  linchpin" of that evaluation, the Court
     stated in Brathwaite. Id., at 114. Where the "indicators of [a witness'] ability to
22   make an accurate identification" are "outweighed by the corrupting effect" of
     law enforcement suggestion, the identification should be suppressed. Id., at
23   114, 116. Otherwise, the evidence (if admissible in all other respects) should be
     submitted to the jury.[19]

24

25           [19] Among "factors to be considered" in evaluating a witness' "ability to make an
26   accurate identification," the Court listed: "the opportunity of the witness to view the criminal
     at the time of the crime, the witness' degree of attention, the accuracy of his prior description
27   of the criminal, the level of certainty demonstrated at the confrontation, and the time between
     the crime and the confrontation." Manson v. Brathwaite, 432 U.S. 98, 114 (1977) (citing Neil
28   v. Biggers, 409 U.S. 188, 199–200 (1972)).

**United States District Court**
For the Northern District of California

29

United States District Court
For the Northern District of California

Applying this "totality of the circumstances" approach, id., at 110, the Court held in Biggers that law enforcement's use of an unnecessarily suggestive showup did not require suppression of the victim's identification of her assailant. 409 U.S., at 199–200. Notwithstanding the improper procedure, the victim's identification was reliable: She saw her assailant for a considerable period of time under adequate light, provided police with a detailed description of her attacker long before the showup, and had "no doubt" that the defendant was the person she had seen. Id. (internal quotation marks omitted). Similarly, the Court concluded in Brathwaite that police use of an unnecessarily suggestive photo array did not require exclusion of the resulting identification. 432 U.S., at 114–117. The witness, an undercover police officer, viewed the defendant in good light for several minutes, provided a thorough description of the suspect, and was certain of his identification. Id., at 115. Hence, the "indicators of [the witness'] ability to make an accurate identification [were] hardly outweighed by the corrupting effect of the challenged identification." Id., at 116.

Perry, 132 S. Ct. at 724-25.

It is undisputed that:

(1) Maria S. knew that the person who dropped off her son and his friends at her house the night of July 24-25, 2003, was African-American;

(2) the police officer who showed her the photos on August 26, 2003, knew that Maria S. had previously told another officer that it was a black person who stabbed the victim;

(3) the photo array consisted of eight photos "depicting seven people," of whom only petitioner was black;

(4) the officer asked Maria S. (through the translator) "if she recognizes any of them;"

(5) Maria S. pointed to the photo of petitioner, and said "they're saying that a black male was the one that killed him," and that "this guy" was the person who came to pick up her son the day after the killing, the person her son told her was "the guy that finished the guy off . . . ."

On these facts it is clear that the photo array, in which petitioner was the only black person, was in fact suggestive. As to whether it was unnecessarily so, the interview of Maria S. was a month after the crime, so there was no more urgency to apprehend an offender who might be a danger to the community than there is in most investigations, and there is no evidence in the record that the police were for some reason unable to obtain additional photographs of black people to include in the array. The array was unnecessarily suggestive.

30

1    See Perry, 132 S. Ct. at 724-25 ("suggestive and unnecessary" standard).

2

3         As to whether the identification was reliable despite the unnecessarily suggestive

4    array, the factors to be considered are (1) the witness' opportunity to view the defendant at

5    the time of the incident; (2) the witness' degree of attention; (3) the accuracy of the witness'

6    prior description; (4) the level of certainty demonstrated by the witness at the time of the

7    identification procedure; and (5) the length of time between the incident and the

8    identification.  See Brathwaite, 432 U.S. at 114; Neil, 409 U.S. at 199-200.  Here there is no

9    evidence regarding Maria S.'s opportunity to view petitioner, or of her degree of attention.

10   She did not provide a description, so there is nothing to consider under point three, and there

11   is no evidence regarding her certainty beyond the fact that she pointed out the photo of

12   petitioner.  The fifth factor, the length of time between the incident and the identification,

13   cuts against reliability, as it was a month after Maria saw a black man that she was shown the

14   pictures.  See Brathwaite, 432 U.S. at 115-16 (listing factor in favor of reliability that witness

15   saw pictures only two days after event, not after "the passage of weeks or months . . . .").

16   Also going to reliability is the fact that when Maria S. viewed the photo array she also

17   identified another man who police later determined was not involved in the crime, Johnson,

18   2009 WL 1154220 at 24 n.38, that Maria S. testified at the grand jury that no black man

19   came by her house, and that in the courtroom identification, Maria S. testified at first that she

20   did not recognize petitioner, then only that he was the person in the photo array she had been

21   shown – that is, the courtroom identification could not have offset the suggestiveness of the

22   photo array.

23        In sum, the photo array was unnecessarily suggestive, and there is insufficient

24   evidence of reliability to outweigh "the corrupting effect" of the suggestive array.  See

25   Brathwaite, 432 U.S. at 114.  Admission of Maria S.'s identification violated due process.

26        Although there was a due process violation, that does not end this Court's inquiry.

27   Habeas relief cannot be granted on this claim unless the state court's rejection of it was

28   "contrary to, or involved an unreasonable application of, clearly established Federal law, as

1   determined by the Supreme Court of the United States;" or was "based on an unreasonable

2   determination of the facts in light of the evidence presented in the State court proceeding."

3   See 28 U.S.C. § 2254(d).

4        The court of appeal's conclusion that  "police did not say or do anything to suggest

5   defendant's involvement in the case before Maria S. was shown a photograph of him" is

6   correct but irrelevant, given that the whole point of federal law on suggestive identifications,

7   as summarized in the quotation from Perry above, is that the photo array itself can be

8   unnecessarily suggestive.  And the federal standard is not whether an identification procedure

9   is "inherently unfair," Johnson, 2009 WL 1154220 at *26, but whether (1) the procedure was

10  "unnecessarily suggestive;" and (2) under the "totality of the circumstances" the procedure

11  created a "substantial likelihood of misidentification."  See Perry, 132 S. Ct. at 724-25.

12       To whatever extent the court of appeal's statement that there was "nothing inherently

13  suggestive about the manner in which Maria S. was shown photographs" is intended to mean

14  that there was nothing inherently suggestive about the array itself, Johnson, 2009 WL

15  1154220 at *26, it is unreasonable.  To whatever extent it is intended to mean that the

16  manner in which the array was presented to the witness was not suggestive, it is irrelevant;

17  the suggestiveness of the array itself is what matters.

18       In sum, the court's implied conclusion that the array was not unnecessarily suggestive

19  was unreasonable.

20       The court of appeal also considered whether the identification nevertheless was

21  reliable and thus admissible:

22            Even assuming arguendo that the identification procedure was
     impermissibly suggestive so as to lead to a substantial likelihood of
23   misidentification, we conclude that the procedure was reliable under the totality
     of the circumstances. (Manson v. Brathwaite, supra, 432 U.S. at p. 114; People
24   v. Ochoa, supra, 19 Cal. 4th at p. 412.) Although the record does not provide
     all the detail that one might ideally wish in order to analyze the relevant factors
25   set forth in Manson and Ochoa, the evidence presented at trial was sufficient to
     demonstrate reliability. As for the opportunity for the witness to view
26   defendant at the time of the crime, Maria S. of course had no such opportunity,
     because she was not a percipient witness to the murder. Although there is
27   conflicting evidence regarding how many times Maria S. viewed defendant
     after the murder, she testified that she viewed him on the night of the murder
28   when he drove four young gang members (who all had blood on their fists and

**United States District Court**
For the Northern District of California

clothes) to her home. The jurors also saw Maria S. on videotape describing to Detective Sappal that "days" after she first saw defendant, he came by her house to pick up her son, who pointed out defendant and described him as " 'the guy that finished the guy [Espinoza] off.' " Although no direct evidence was elicited from Maria S. regarding her degree of attention at either time (and she testified at trial that defendant did not, in fact, visit her house a second time), she presumably would have been attentive while she observed defendant accompanied by her son and their companions in bloody clothes, and while her son days later was pointing defendant out as the person who "finished off" the victim. We recognize that no evidence was presented to the jury regarding the accuracy of any description Maria S. may have given police before she identified defendant's photograph. Most notable, however, was her degree of certainty regarding her identification of defendant's photograph. She first identified "Sammy" as being in one of the photographs shown to her, then immediately identified defendant's photograph and identified him as the person who "finished off" the victim. Finally, the record establishes that only about one month elapsed between the time Maria S. viewed defendant the night of the murder (on July 25, 2003) and her identification of his photograph (on August 26), and a little less than a month between defendant coming to Maria S.'s house days after the murder to pick up her son and the photographic identification. Under the totality of the circumstances, we do not find that Maria S.'s identification of defendant was unreliable.

Johnson, 2009 WL 1154220 at *26 n.40.

As this Court's discussion of reliability above at pages thirty-two and thirty-three demonstrates, the identification was far from reliable. It is not even clear how many times Maria S. saw petitioner, and the court of appeal correctly notes that there is no evidence of the degree of attention she was giving to events. Her view of the person who drove the juveniles home was from a second story window at night, which suggests that she may well have known no more about the driver's appearance than that he was black – and there was only one black in the photo array. The court of appeal's conclusion regarding the witness' certainty of identification is completely unsupported, and as discussed above, that a month passed between her sights of him and presentation of the photo array cuts against reliability, not in favor of it. In short, the court of appeal's conclusion regarding reliability also was unreasonable.

Because both the court of appeal's conclusion as to whether the array was unnecessarily suggestive and its conclusion as to reliability were unreasonable, habeas relief is not barred by the AEDPA. See 28 U.S.C. § 2254(d).

Although there was a due process violation and the AEDPA does not bar relief, the court must also consider whether the error was harmless.

33

**United States District Court**
For the Northern District of California

1       A habeas petitioner is not entitled to relief unless the trial error had substantial and

2   injurious effect or influence in determining the jury's verdict. Brecht, 507 U.S. at 637

3   (1993).  In other words, state prisoners seeking federal habeas relief may obtain plenary

4   review of constitutional claims of trial error, but are not entitled to habeas relief unless the

5   error resulted in "actual prejudice."   Id.  The court must assess the prejudicial impact of a

6   constitutional error in a state-court criminal trial under the Brecht standard, whether or not

7   the state appellate court recognized the error and reviewed it for harmlessness.  Fry v. Pliler,

8   551 U.S. 112, 121-22 (2007).

9       Here, the reasons discussed above why the identification was not reliable were

10  brought out on cross-examination.  In addition, Maria S. admitted to having told the police

11  that petitioner had not come by her house, that her identification was based on what her son

12  had told her and not on personal observation, and that she had lied to the police to help get

13  her son out of jail.  It thus is doubtful that the identification had much impact.  More

14  importantly, petitioner was named at trial as the killer by the four juveniles, Daniel G.

15  (Danny G.), Joey O., Sammy V., and Brandon V.  In light of this, the error could not have

16  had a substantial and injurious effect or influence in determining the jury's verdict; it was

17  harmless.  This claim is without merit.

18      7.   **Miranda**

19      Petitioner was advised of his Miranda[20] rights shortly after his arrest.  He invoked his

20  right to counsel and the police ended the interrogation.  About an hour and half later, he

21  contacted an investigator and talked to him; petitioner contends that the officer did not obtain

22  a valid Miranda waiver for this second interview.  The statements he contends should have

23  been excluded relate to his gang membership.

24      The court of appeals set out the background:

25          When defendant and Fiu were still to be tried together, defendant moved
        in limine to suppress statements that he made to a detective on the day he was
26      arrested, alleging that his Fifth Amendment rights were violated under the
        principles set forth in Miranda, supra, 384 U.S. 436. In response to the motion,
27      the prosecutor presented the following evidence to establish that defendant

28  _____

         [20] Miranda v. Arizona, 384 U.S. 436, 473-74 (1966)

validly waived his Miranda rights:

A few hours after defendant's early-morning arrest on August 16, 2003, Detectives Sappal and Greg Gibson spoke with defendant at the Richmond Police Department. Defendant was advised of his Miranda rights. While the detectives were advising him of his rights, defendant repeatedly stated that he was tired, and detectives asked him to "stay with us a little bit" and asked, "Are you high, falling asleep on me or what?" After being advised of his rights, defendant said, "I would like to wait till a lawyer's present to represent me." After a few follow-ups questions from Detective Gibson, defendant said, "I don't want to talk about nothing I don't know nothing about." The interview ended, and defendant was taken to jail to be booked.

About an hour and a half later, Detective Gibson went to the jail after he was told by a jailer that defendant wished to speak to him. According to a transcript of what transpired in the interview room, defendant first asked for cigarettes and then said that there was "a web or something running across [his] eyes or something." Detective Gibson told defendant to stand up, and the following exchange then took place:

"[Defendant]: I was talking to my mom, and she said you came, you came and took her car and all this, you feel me?

"Det. Gibson: Yeah, I feel you. [¶] Let me back up here a little bit. Earlier you wouldn't talk to me. You wanted to talk to an attorney so we stopped. That's your prerogative, you can do that. You know, anytime you want, you can do that. [¶] You told the jailer up there, I don't know her name, you told her that you wanted to talk to us again, but you wanted to talk to me, not the other detective that was in here. And I don't know what that's all about.

"[Defendant]: I'm not worried about him [Detective Sappal] being present.

"Det. Gibson: Okay.

"[Defendant]: My thing is this, I'm trying to figure out why you all picking on my mama now...."

Defendant proceeded to speak with Detective Gibson.

Detective Sappal acknowledged at the hearing on defendant's motion to suppress that Officer Gibson did not read defendant his Miranda rights before the second interview, and that defendant started talking before Gibson was able to clarify whether defendant still wanted an attorney as he had previously requested.

Defendant argued that because Detective Gibson did not readvise him of his Miranda rights, and because defendant did not acknowledge that he told a jailer he wished to speak to the detective, the prosecutor failed to demonstrate that he waived his Miranda rights. The trial court tentatively concluded that, under the totality of the circumstances, defendant was readvised of his right to counsel when Detective Gibson returned to speak with him relatively soon after he first spoke with detectives, and that defendant nonetheless chose to talk even though he understood he was free to remain silent. However, in response to requests from both the prosecutor and defendant's counsel, the trial court stated

United States District Court
For the Northern District of California

that it would read the entire transcript of the interview or view a videotape before it made a final ruling, in order to evaluate defendant's demeanor.[Footnote omitted]

When the trial court revisited the issue one week later, it indicated that it had read the transcript and viewed the videotape of the interviews. The court concluded that there was insufficient evidence that defendant had reinitiated contact with detectives, and requested that the prosecutor present evidence from the jailer who had reported that defendant wanted to speak with police. The court briefly addressed the issue of whether defendant was readvised of his Miranda rights, stating that detectives "reminded him he didn't have to talk, and they said it was he that wanted to talk to them, and he didn't deny that. So you might have, as I say, an implicit admission that Mr. Johnson was the one who wanted the conversation reopened. I'd have to think that one over."

The court did not address the issue again until several weeks later (when defendant was being tried alone), after the prosecutor claimed that the defense had opened the door to admission of defendant's statement by referring to it on cross-examination of Detective Sappal. The prosecutor had not at that time presented any evidence from the jailer as the trial court previously had suggested; however, the court ultimately concluded that the prosecutor need not present such evidence. Citing People v. Riel (2000) 22 Cal. 4th 1153, the court concluded that because defendant did not deny that he told the jailer he wanted to speak with the detective again, he adopted Detective Gibson's statement that he had requested his presence. The court concluded that there was therefore sufficient evidence that there was no Miranda violation when Detective Gibson spoke with defendant on August 16. The court made no express finding as to whether defendant knowingly and intelligently waived his Miranda rights before speaking with Gibson, only as to whether defendant reinitiated contact with the detective.

Johnson, 2009 WL 1154220 at *27-28.

The court of appeal addressed the waiver question:

We may affirm an implied finding of waiver if supported by the record. (In re Dennis M. (1969) 70 Cal. 2d 444, 465; People v. Nitschmann (1995) 35 Cal. App. 4th 677, 682.)[21] Here, a review of the particular facts and circumstances of the case leads us to conclude that defendant impliedly waived his Miranda rights after he reinitiated contact with police. As to whether he was aware of his rights before waiving them, defendant reinitiated contact with police only about an hour and a half after he was formally read his Miranda rights and invoked them. Although Detective Gibson did not repeat a formal Miranda advisement when he returned to speak with defendant, he certainly reminded defendant of his previously invoked rights when he told him, "Earlier you wouldn't talk to me. You wanted to talk to an attorney so we stopped. That's your prerogative, you can do that. You know, anytime you want, you can do that." ([Emphasis] added.) Defendant proceeded to speak to the detective without ever requesting the presence of an attorney, an indication that he intended to waive his right to have one present. (People v. Whitson (1998) 17

---

[21] The court in this case apparently was leaning toward finding that defendant impliedly waived his Miranda rights when it first considered defendant's motion; however, the court made no express findings on this issue when it made its final ruling.

36

Cal. 4th 229, 250 [express waiver not required where defendant's actions make clear waiver is intended].) The transcript of defendant's interview reveals that his answers were clear and responsive, further support for the conclusion that he was aware of his rights before waiving them. (Id. at p. 249.)

As for defendant's background, experience, and conduct (North Carolina v. Butler, supra, 441 U.S. at pp. 374-375), the record amply supports a finding that he knowingly, intelligently, and voluntarily waived his Miranda rights. Defendant was on parole when he was arrested, evidence that he had previous experience with law enforcement. The manner in which defendant first invoked his right to counsel (stating, "With them rights, I would like to wait till a lawyer's present to represent me") likewise demonstrates that defendant had experience with the legal system, the consequences of speaking with law enforcement, and his right to have a lawyer present to represent him. The fact that defendant spoke to Gibson, after Gibson reminded him of his prior invocation and his continuing right to counsel, without requesting an attorney or indicating he wished to stop the interview showed that he had " 'changed his mind without any impropriety on the part of the police.' " (Oregon v. Bradshaw, supra, 462 U.S. at p. 1046.) We stress that here, as in People v. Whitson, supra, 17 Cal. 4th 229, "the record is devoid of any suggestion that the police resorted to physical or psychological pressure to elicit statements from defendant. To the contrary, defendant's willingness to speak with [Gibson] is readily apparent from his responses. He was not worn down by improper interrogation tactics, lengthy questioning, or trickery or deceit." (Id. at pp. 248-249.) The trial court did not err when it denied defendant's motion to suppress.

Even assuming arguendo that it was error to admit portions of defendant's statements to Detective Gibson, any such error was harmless beyond a reasonable doubt. (Chapman v. California (1967) 386 U.S. 18, 24; People v. Coffman and Marlow (2004) 34 Cal. 4th 1, 60; People v. Lujan (2001) 92 Cal. App. 4th 1389, 1403.) We first emphasize that it was defendant who opened the door to admission of statements he made to police by cross-examining Detective Sappal at trial about information defendant provided to Detective Gibson[22] about his alibi. Although the prosecutor was permitted to ask certain questions about the August 16 interview, the transcript of the interview was not shown to the jury. The transcript contains references to defendant's parole officer and defendant's contact with him. The prosecutor was not permitted to ask questions that would elicit responses about defendant's parole status or his parole officer, after defendant objected to the admission of that evidence. Moreover, defendant did not confess to the crime. To the contrary, the evidence of defendant's statement that was admitted included testimony that defendant repeatedly denied his involvement in the murder, and that he did not have any problems with "'Easter Hill Mexicans.'"

Defendant briefly argues on appeal that he was prejudiced by the admission of his interview with Detective Gibson, because it provided evidence

---

[22] Detective Gibson did not testify at trial because of health reasons. Detective Sappal watched Detective Gibson's August 16 interview of defendant in an adjacent room via video camera, and he testified at trial about what he observed.

37

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1  of his former membership in a gang.[23]  Defendant's statements about gang

2  membership were consistent with testimony from other witnesses (which we

   already have concluded was properly admitted, see ante, []).). In light of the fact

3  that defendant opened the door to the admission of certain of his statements to

   police, the fact that the statements did not directly implicate him in the murder,

4  and the fact that his statements were consistent with other testimony offered at

   trial, we conclude that any error in their admission was harmless beyond a

   reasonable doubt.

5

   Johnson, 2009 WL 1154220 at *30-31 (footnotes in original but renumbered).

6

7          Once properly advised of his rights, an accused may waive them voluntarily,

8  knowingly and intelligently.  Miranda, 384 U.S. at 475.  "The waiver inquiry 'has two

9  distinct dimensions': waiver must be 'voluntary in the sense that it was the product of a free

10 and deliberate choice rather than intimidation, coercion, or deception,' and 'made with a full

11 awareness of both the nature of the right being abandoned and the consequences of the

12 decision to abandon it.' [Moran v.] Burbine, [475 U.S. 412], [] 421 [1986]."  Berghuis v.

13 Thompkins, 130 S. Ct. 2250, 2260 (2010).  A waiver may be implied by conduct; it need not

14 be explicit or written.  Id., 130 S. Ct. at 2260-61.  The distinction between a claim that a

15 Miranda waiver was not voluntary, and a claim that such waiver was not knowing and

16 intelligent, is important.  Cox v. Del Papa, 542 F.3d 669, 675 (9th Cir. 2008).  The

17 voluntariness component turns on the absence of police overreaching, i.e., external factors,

   whereas the cognitive component depends upon the defendant's mental capacity.  Id.

18         Here, there is no evidence of any police over-reaching; indeed, the evidence is that

19 Detective Gibson was careful to remind petitioner that he had invoked his right to remain

20 silent.  Petitioner's statements to Gibson thus were voluntary.  And as to whether they were

21 knowing and intelligent, the factors relied upon by the court of appeal are convincing:

22 Petitioner had been given the full formal Miranda warnings only an hour and a half earlier,

23 and shown he understood them by invoking his right to remain silent and to a lawyer.  He

24

25         [23] Sappal testified that defendant told Gibson, " 'I'm not no mother fucking Sureno.

26 I'm not no mother fucking Norteno, man. I'm a young [B]lack man formerly known from a
   15th Street gang, man. That's where I'm from, man. You feel what I'm saying?' " Detective

27 Gibson said, " '15th Street hasn't been beefing with anybody for a long time,' " to which
   defendant responded, " 'Them mother fuckers been beefing. They've been beefing[.]' "

28 Defendant later added, " 'But the thing of it is mother fuckers who know this shit ain't worth
   it, ain't beefing no more[.]' "

**United States District Court**
For the Northern District of California

was reminded of at least the gist of the warning when he reinitiated contact with Detective Gibson.  And he had previous experience with law enforcement.  The implied waiver thus was knowing and intelligent.

Because the waiver was voluntary and knowing and intelligent, admission of the statements was not a <u>Miranda</u> violation.  The court of appeal's rejection of this claim was not contrary to, or an unreasonable application of, clearly-established United States Supreme Court authority.

### 8.   <u>Instructions on Aiding and Abetting and Conspiracy</u>

Petitioner argues his constitutional rights were violated when "[t]he court gave largely bare-bones CALJIC  instructions for aiding and abetting and conspiracy liability, both tied to the natural and probable consequences doctrine."  Pet. at 18.  His arguments turn on the fact that he was not involved in the first beating of the victim, only the second.

Whether alone or in combination, he argues, the purported instructional errors deprived him of a fair hearing because they "failed to provide a minimally coherent or intelligible way to determine the *extent* of culpability under the [natural and probable consequences] doctrine; substituted an improper presumption of criminal intent based on a negligence/foreseeability standard for actual criminal intent, relieving the prosecution from proving an essential element of both criminal offenses and accomplice liability; deprived appellant of a jury determination beyond a reasonable doubt on all material issues; and impermissibly reduced the prosecution's burden of proof on essential intent, act, and concurrence elements."  Pet. at 27 (citations omitted).

### A.   **Standard of Review**

"Even if there is some 'ambiguity, inconsistency or deficiency' in [a jury] instruction, such an error does not necessarily constitute a due process violation."  <u>Waddington v. Sarausad</u>, 555 U.S. 179, 190 (2009) (quoting <u>Middleton v. McNeil</u>, 541 U.S. 433, 437 (1977)).  "Rather, the defendant must show both that the instruction was ambiguous and that there was "'a reasonable likelihood'" that the jury applied the instruction in a way that relieved the State of its burden of proving every element of the crime beyond a reasonable

doubt." Id. at 190-91 (quoting Estelle v. McGuire, 502 U.S. 62, 72 (1991) (internal quotation marks and citation omitted); see also Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974) ("'[I]t must be established not merely that the instruction is undesirable, erroneous or even "universally condemned," but that it violated some [constitutional right].'").

The instruction may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record. Estelle, 502 U.S. at 72. In other words, the court must evaluate jury instructions in the context of the overall charge to the jury as a component of the entire trial process. United States v. Frady, 456 U.S. 152, 169 (1982) (citing Henderson, 431 U.S. 145, 154 (1977).

A determination that there is a reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution establishes only that an error has occurred, however. See Calderon v. Coleman, 525 U.S. 141, 146 (1998). A habeas petitioner is not entitled to relief unless the instructional error "'had substantial and injurious effect or influence in determining the jury's verdict.'" Brecht, 507 U.S. at 637 (quoting Kotteakos, 328 U.S. at 776). In other words, state prisoners seeking federal habeas relief may obtain plenary review of constitutional claims of trial error, but are not entitled to habeas relief unless the error resulted in "actual prejudice." Id. (citation omitted); see, e.g., Coleman v. Calderon, 210 F.3d 1047, 1051 (9th Cir. 2000) (finding Brecht error where "at the very least" the court could not "'say with fair assurance . . . that the judgment was not substantially swayed by the [instructional] error.'") (citation omitted).

### B.    Lesser Offense

Petitioner contends that his due process rights were violated by the trial court's failure to instruct the jury that an aider and abetter can be convicted of a lesser offense than the perpetrator. The court of appeal rejected the claim because the California Supreme Court has approved of CALJIC No. 3.02 as an adequate explication of the natural and probable consequences doctrine. Johnson, 2009 WL 1154220 at *32, n.48

Petitioner's argument concerning the need for an instruction on a lesser included offense is based on People v. Woods, 8 Cal. App. 4th 1570 (1992), which holds:

United States District Court
For the Northern District of California

1
2
3
4
5

> when the evidence raises a question whether the greater offense is a reasonably foreseeable consequence of the act aided and abetted but establishes that a lesser offense is such a consequence, the jury would be provided with an unwarranted all-or-nothing choice with respect to the aider and abettor. … [A] jury may be reluctant to acquit of the greater crimes if left without the alternative of a guilty verdict for petty theft. [citations omitted]. Either result (acquittal of the aider and abettor although the evidence establishes guilt of a lesser offense, or conviction for the greater offense because the jury has no option of finding the defendant liable for the lesser crime) is unjust and unacceptable.

6

8 Cal. App. 4th at 1589.

7
8
9
10

The court of appeal rejected petitioner's argument after finding the jury instructions given did apprise the jury that the petitioner could be found guilty of a lesser offense.  The instruction to which the court referred was CALJIC 3.02, as modified at trial, which includes the following language:

11
12
13
14
15
16
17
18
19

> In order to find the defendant guilty under this principle of the crime of murder as charged in Count One, or *the lesser included crimes of attempted murder or manslaughter*, you must be satisfied beyond a reasonable doubt that: [¶] 1. The crime of assault with force likely to cause great bodily injury was committed; [¶] 2. That the defendant aided and abetted that crime, that is the crime of assault with force likely to cause great bodily jury [*sic*–injury]; [¶] 3. That a co-principal in that crime committed the crime of murder, attempted murder or manslaughter, depending on which one is at issue; and [¶] 4. That such crime was a natural and probable consequence of the commission of the crime of assault with force likely to cause great bodily injury. … You are not required to unanimously agree as to which originally contemplated crime the defendant aided and abetted, so long as you are satisfied beyond a reasonable doubt and unanimously agree that the defendant aided and abetted the commission of an identified and defined target, and that *the crime of murder or attempted murder or manslaughter, depending upon which one was at issue*, was a natural and probable consequence of the commission of that target crime."

20
21
22
23
24
25
26
27
28

Johnson, 2009 WL 1154220 at *32 (italics in original).  The jury was also instructed in accordance with CALJIC 6.11, as modified at trial, which stated, in relevant part, that the jury "must determine whether the defendant is guilty as a member of a conspiracy to commit the originally agreed upon crime or crimes. And if so, whether the crime of murder alleged in Count One *or the lesser crimes of attempted murder or that of manslaughter* was perpetrated by a co-conspirator or co-conspirators in furtherance of that conspiracy and was a natural and probable consequence of the agreed upon criminal objective of that conspiracy."  Id. at *32 (italics in original).  The court of appeal examined other instructions given at trial and

41

"conclude[d] that, when viewed as a whole, the instructions provided sufficient guidance to jurors ."

> The jurors were elsewhere instructed, pursuant to CALJIC No. 8.70 [footnote omitted], that it was their duty to determine the degree of murder. They were provided with the definition of murder "as charged in Count One" (CALJIC No. 8.10) and the definitions of first and second degree murder (CALJIC Nos. 8.20, 8.30, 8.31), and they were told that they must convict defendant of murder in the second degree if they agreed that murder was committed but had reasonable doubt as to whether it was of the first degree (CALJIC No. 8.71). Consistent with those instructions, the jury verdict form indicated that, in the event jurors found defendant guilty of murder, they were to specify whether he was guilty of murder in the first or second degree. Although it might have been helpful to modify CALJIC Nos. 3.02 and 6.11 to make it clear that the jurors were to determine which degree of murder was reasonably foreseeable, we conclude that, when viewed as a whole, the instructions provided sufficient guidance to jurors.

Id. at *33.  The court distinguished <u>Woods</u> as follows:

> Here, the jurors were not given an all-or-nothing choice, as CALJIC No. 3.02 specifically informed them of alternative crimes (murder, attempted murder, and manslaughter) which could be the natural and probable consequence of the target offense. Moreover, in <u>Woods</u>, it was undisputed that Windham was not the actual perpetrator of first degree murder, and he was prosecuted solely under the natural and probable consequences doctrine. (<u>Woods</u> at p. 1579.) Here, by contrast, as we have already concluded, there was evidence that defendant was guilty of first degree murder *as an actual perpetrator* (*ante*, § II.C.1.); the natural and probable consequences doctrine was simply an alternative theory of guilt.

<u>Id.</u> (italics in original).

For the reasons set out by the court of appeal, there was not here a reasonable likelihood that the jury applied the instruction in a way that relieved the prosecution of its burden of proving every element of the crime beyond a reasonable doubt.  <u>Waddington</u>, 555 U.S. at 190-91 (standard).

## C.    Foreseeability Determination

Petitioner claims that his due process rights were violated by the trial court's failure to instruct the jury "that the objective foreseeability determination is (1) to be based upon a reasonable person *in the defendant's position* and (2) may [sic] only consider those facts *known* to the defendant." Pet. at 21 (italics in original).

The court of appeal held that "[t]he jury instructions (CALJIC Nos. 3.02, 6.11) adequately communicated these principles." <u>Johnson</u>, 2009 WL 1154220 at *34.  Both jury

**United States District Court**
For the Northern District of California

United States District Court
For the Northern District of California

1  instructions specifically informed the jury that "[i]n determining whether a consequence is

2  natural and probable, you must apply an objective test based not on what the defendant

3  actually intended, but on what a person of reasonable and ordinary prudence would have

4  expected would be likely to occur." Id. *32, 33.  Both jury instructions informed the jury that

5  "[T]he issue is to be decided in light of all of the circumstances surrounding the incident."

6  Id.  There is no 'reasonable likelihood' that the jury misapplied the instruction to relieve the

7  prosecution of its burden of proving each element of the crime beyond a reasonable doubt.

8                  **D.      Independent Intent**

9      Petitioner claims he was entitled to have included in "the CALJIC aiding and abetting

10 series" an instruction "explaining the aider and abettor is not [] liable for first degree murder

11 if a premeditated killing was an independent product of the actual killer's (e.g., Fiu's) mind."

12 Pet. at 22.

13     The court of appeal rejected the petitioner's claim that a special instruction on

14 independent intent was required:

15         To the contrary, the jury was instructed (pursuant to CALJIC No. 3.01) that an
           aider and abettor must act with the intent of committing, encouraging, or
16         facilitating the commission of the target crime. "Th[is] concept[] fully informed
           the jury of applicable principles of vicarious liability in this context." (People
17         v. Coffman and Marlow, supra, 34 Cal. 4th at p. 107 [CALJIC No. 3.01
           adequately informed jury of necessary intent it must find].)
18
   Johnson, 2009 WL 1154220 at *34.

19     The jury was instructed, pursuant to CALJIC 3.01 as discussed previously, that

20 petitioner could be found guilty of a premeditated killing as an aider and abettor only if he

21 acted with the intent of facilitating the killing of Espinoza.  There was not a reasonable

22 likelihood that the instruction relieved the prosecution of its burden to prove the necessary

23 intent element beyond a reasonable doubt.  See Waddington, 555 U.S. 190-91 (standard).

24                  **E.      Consequence of Conspiracy**

25     Petitioner claims "CALJIC No. 6.16 indicates a conspirator is liable for acts that do

26 not further the common plan, so long as they are natural results; even if this is the rule for

27 aiding and abetting, this is not the law of conspiracy."  Pet. at 22-23.  CALJIC No. 6.16

28

                                       43

**United States District Court**
For the Northern District of California

states: "Where a conspirator commits an act which is neither in furtherance of the object of the conspiracy nor the natural and probable consequence of an attempt to attain that object, he alone is responsible for and is bound by that act, and no responsibility therefore attaches to any of his confederates."  Petitioner claims the giving of this instruction "watered down the conspiracy instructions ... where the existence of an 'common' plan was far from clear." Id.

The court of appeal addressed this claim by pointing out the jurors were also informed by CALJIC 6.11 "which defendant identifies as a correct statement of the law," that the jury "could not find defendant guilty under conspiracy theory if [the] charged crime was not [the] natural and probable consequence of conspiracy." Johnson, 2009 WL 1154220 at *34.

Given the correct statement of the law in CALJIC 6.11, and the ambiguity of 6.16, there was not a reasonable likelihood that the instruction relieved the prosecution of its burden to prove the elements of the offense beyond a reasonable doubt. See Waddington, 555 U.S. at 190-91 (standard).

### F.    Second Degree Murder as a Lesser Offense

Petitioner claims that because the instructions relating to lesser offenses did not specifically mention second degree murder, the jurors may not have realized the prosecution had to show a premeditated murder was foreseen by the petitioner, "not just an implied malice assault, or a rash intentional killing."  Pet. at 23.

The court of appeal held the instructions were adequate:

[J]urors were not instructed to consider a particular lesser offense. Specifically, they were not told how, or whether, to make a determination of what *degree* of murder was a reasonably foreseeable consequence of the assault that defendant aided and abetted. They were instructed that they could convict defendant of "murder" under the natural and probable consequences doctrine, but were not specifically told (pursuant to CALJIC Nos. 3.02 or 6.11) that they could choose between first and second degree murder. When read together with the other instructions given to the jury, however, we find that the jurors were adequately informed of their options and duties, and conclude that the trial court was not under a sua sponte duty to clarify the instructions at issue.  Jurors were instructed that they could find defendant guilty of murder, as charged in count one. Count one of the information, in turn, alleged that defendant was guilty of murder, without specifying a degree. The jurors were elsewhere instructed, pursuant to CALJIC No. 8.70, that it was their duty to determine the degree of murder. They were provided with the definition of murder "as charged in

United States District Court
For the Northern District of California

1    Count One" (CALJIC No. 8.10) and the definitions of first and second degree
2    murder (CALJIC Nos. 8.20, 8.30, 8.31), and they were told that they must
     convict defendant of murder in the second degree if they agreed that murder
3    was committed but had reasonable doubt as to whether it was of the first degree
     (CALJIC No. 8.71).  Consistent with those instructions, the jury verdict form
4    indicated that, in the event jurors found defendant guilty of murder, they were
     to specify whether he was guilty of murder in the first or second degree.
5    Although it might have been helpful to modify CALJIC Nos. 3.02 and 6.11 to
     make it clear that the jurors were to determine which degree of murder was
6    reasonably foreseeable, we conclude that, when viewed as a whole, the
     instructions provided sufficient guidance to jurors.

7    Johnson, 2009 WL 1154220 at *33 (footnotes omitted) (italics in original).

8         Given the instructions cited by the court of appeal, and the fact that the jury verdict

9    form required the jury to decide whether the murder was of the first degree or the second

10   degree, there was not a reasonable likelihood that the omission relieved the prosecution of its

11   burden to prove the elements of the offense beyond a reasonable doubt.

12              **G.     Acts of Others Prior to Second Assault**

13        Petitioner contends that the trial court violated his due process rights by giving

14   versions of CALJIC 6.11 and CALJIC 3.01 that, he asserts, allowed the jury to find him

15   guilty based on the first attack, the one in which he had no hand.[24]

16        The trial court gave CALJIC 6.11, relating to conspiracy.  The court of appeal

17   emphasized the relevant portion:  "[J]urors were provided with optional language that

18   provided that a 'member of a conspiracy is not only guilty of the particular crime that to

19   [his][or][her] knowledge [his][or][her] confederates agreed to and did commit, *but is also*

20   *liable for the natural and probable consequences of any [crime] or [act] of a co-conspirator*

21   *done to further the object of the conspiracy, even though that [crime] or [act] was not*

22   *intended as a part of the agreed upon objective and even though [he][or][she] was not*

23   *present at the time of the commission of that [crime] or [act].*'" Id. at *34 (italics in

24   original).  The court of appeal pointed out that the jury was also "instructed that defendant

25

26        [24] Petitioner also contends that "[i]f defense counsel were somehow required to lodge
     further objections or requests, . . . the failure to do so denied appellant the effective
27   assistance of counsel." Pet. at 18-19.  Because the court of appeal and this court have
     considered and rejected petitioner's arguments on the merits, counsel's failure to object was
28   neither deficient performance nor did it prejudice petitioner.

45

United States District Court
For the Northern District of California

1  could not be found liable for acts committed before he joined the conspiracy (CALJIC

2  6.19)," and so concluded that there was no error.  Id.  Because CALJIC 6.19 did not conflict

3  with CALJIC 6.11 as given, but rather was a more specific narrowing of it, there was not a

4  reasonable likelihood that 6.11 relieved the prosecution of its burden to prove the elements of

5  the offense beyond a reasonable doubt.

6      Petitioner contends that CALJIC 3.01 had a similar defect:

7          As to CALJIC No. 3.01, the instruction as given provides: "A person
         aids and abets the [commission] [or] [attempted commission] of a crime when

8      he or she: [¶] (1) With knowledge of the unlawful purpose of the perpetrator,
         and [¶] (2) With the intent or purpose of committing or encouraging or

9      facilitating the commission of the crime, and [¶] (3) By act or advice aids,
         promotes, encourages or instigates the commission of the crime. [¶] [ A person

10     who aids and abets the [commission] [or] [attempted commission] of a crime
         need not be present at the scene of the crime.] [¶] [Mere presence at the scene

11     of a crime which does not itself assist the commission of the crime does not
         amount to aiding and abetting.] [¶] [Mere knowledge that a crime is being

12     committed and the failure to prevent it does not amount to aiding and
         abetting.]" (Italics added.) Defendant argues on appeal that the italicized

13     portion of the instruction led jurors to believe they could find defendant guilty
         based on the natural and probable consequences doctrine for others' actions in

14     the first attack.

15  Id. at 35.  The court of appeal rejected the argument, saying:

16         We disagree with defendant's argument that the jury was led to believe
         that it could convict defendant based on the first attack on the victim. CALJIC

17     No. 3.01 makes it clear that jurors could convict defendant only if he had
         knowledge of the perpetrator's unlawful purpose when he promoted,

18     encouraged, or instigated the commission of the crime-knowledge he could not
         have had regarding the first attack because it took place before he was present,

19     a point that was undisputed at trial. Neither the prosecution's case, nor any
         evidence presented, indicated that defendant aided and abetted the first attack

20     on the victim. The bracketed instructions defendant now objects to were at
         most unnecessary, because there were no crimes which he aided and abetted

21     but for which he was not present. Because jurors also were informed that not
         all instructions were necessarily applicable (CALJIC No. 17.31) and that the

22     instructions should be considered as a whole (CALJIC No. 1.01), we disagree
         with defendant's argument there was a possibility that jurors convicted

23     defendant based on events that took place before he arrived.

24  Id.

25      As the court of appeal pointed out, the jury could not convict petitioner on an aiding

26  and abetting theory unless it found that he had knowledge of the perpetrator's unlawful

27  purpose at the time he aided and abetted.  It thus would not be possible for a jury following

28  the instructions – as the Court must presume it did, see Richardson v. Marsh, 481 U.S. 200,

206 (1987) – to convict on the basis of a first attack that petitioner was not involved in and did not know of at the time it occurred.  There was not a reasonable likelihood that 3.01 as given relieved the prosecution of its burden to prove the elements of the offense beyond a reasonable doubt.

### 9.   Instruction on Impeached Witnesses

Defense counsel requested, and the trial court gave, CALJIC 2.21.2.  CALJIC 2.21.2 instructs the jury that it "may reject the testimony of a witness found to have testified falsely on a material point, unless jurors believe 'the probability of truth favors his or her testimony in other particulars.'"  Johnson, 2009 WL 1154220 at *36.  Petitioner contends that this violated due process because it allowed the jury to evaluate testimony on a probability standard, rather than the "beyond a reasonable doubt" standard.

The court of appeal held:

> Even assuming that defendant's argument is not waived due to invited error as respondent argues, it lacks merit. As defendant acknowledges, our Supreme Court has previously considered, and rejected, his argument. (People v. Maury (2003) 30 Cal.4th 342, 428-429.) "When CALJIC No. 2.21.2 is considered in context with CALJIC Nos. 1.01 (consider instructions as a whole) and 2.90 (burden of proof), [which were given in this case,] 'the jury was adequately told to apply CALJIC No. 2.21.2 "only as part of the process of determining whether the prosecution had met its fundamental burden of proving [defendant's] guilt beyond a reasonable doubt." [Citation.]' [Citation.]" (Id. at p. 429.) We reject defendant's due process argument. (Auto Equity Sales, Inc. v. Superior Court, supra, 57 Cal.2d at p. 455.)

Johnson, 2009 WL 1154220 at *37.

It is clearly established that the Constitution requires proof beyond a reasonable doubt of every fact necessary to constitute the crime with which a defendant is charged.  See In re Winship, 397 U.S. 358, 364 (1970).  However, whether a witness has testified falsely is not a "fact necessary to constitute the crime charged," so Winship does not require application of the "beyond a reasonable doubt"standard to CALJIC 2.21.2.  This claim is without merit.

### 10.   CALJIC NO. 2.90

Petitioner claims the 'abiding conviction' language in CALJIC 2.90, defining reasonable doubt, "convey[s] an insufficient standard of proof akin to clear and convincing evidence."  The court of appeal rejected the claim "[b]ecause our Supreme Court has

United States District Court
For the Northern District of California

approved the challenged jury instruction as a correct statement of the government's burden of proof  (People v. Brown (2004) 33 Cal.4th 382, 392)."  Johnson, 2009 WL 1154220 at *37.

In Victor v. Nebraska, 511 U.S. 1 (1994), the Court specifically stated that "[a]n instruction cast in terms of an abiding conviction as to guilt, without reference to moral certainty, correctly states the government's burden of proof." Id. at 14–15; see also Lisenbee v. Henry, 166 F.3d 997, 999-1000 (9th Cir. 1999) (use of term "abiding conviction" in defining reasonable doubt is constitutionally sound).  Giving the instruction did not violate petitioner's rights.

**11.    Cumulative Error**

Petitioner alleges that his above claims, even if they do not amount to constitutional error in themselves, when added together show that the trial as a whole was a violation of due process, i.e., cumulative error.  But when there is no constitutional error, there is nothing to accumulate.  Mancuso, 292 F.3d at 957.  This claim is without merit.

**CONCLUSION**

For the foregoing reasons, the petition for a writ of habeas corpus is DENIED.

A certificate of appealability under 28 U.S.C. § 2253(c) is DENIED because petitioner has not demonstrated that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  Slack v. McDaniel, 529 U.S. 473, 484 (2000).  The clerk shall enter judgment in favor of respondent and close the file.

SO ORDERED.

DATED:   April 30, 2012

CHARLES R. BREYER
United States District Judge

1

2   G:\PRO-SE\CRB\HC.10\Johnson, E1.deny-gaw.wpd

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
For the Northern District of California